8

**STATE, Plaintiff-Appellee, v DIXON, Defendant-Appellant.**

Ohio Appeals, Seventh District, Geauga County.

No. 266.  Decided March 10, 1947.

H. K. Bostwick, Prosecuting Attorney, Chardon, for plaintiff-appellee.

A. M. Balogh, Cleveland, for defendant-appellant.

## OPINION

By PHILLIPS, J.

Acting under authority conferred upon it by §5652-16 GC, the District Board of Health of Geauga County, Ohio, on May 1, 1945, resolved and declared rabies "to be prevelant in surrounding and adjoining counties and in order to protect the public health of Geauga County as is provided by §1261-26 GC, said Board hereby declares a quarantine of all dogs in said health district of Geauga County, Ohio"; and following in part the language of that section of the General Code in its "Dog Quarantine—Order or Regulation No. 1" declared such quarantine "shall consist of the confinement of any dog or dogs on the premises of the owner * * *; provided, a dog may be permitted to leave the premises of the owner if under leash or under the control of the owner or other responsible person"; and caused notice of the publication of the declaration of such quarantine and of its strict enforcement beginning June 10, 1946, to be "published in the Geauga County paper on the date of Thursday, June 20, 1946."

A justice of the peace in and for Munson Township in Geauga County, Ohio, issued a warrant for the arrest of the defendant upon an affidavit, signed and filed by the dog warden of Geauga County, charging that on the fifth day of July, 1946, defendant "did unlawfully violate the regulation of the Board of Health of said county having to do with the quarantine of dogs, to-wit §5652-16 GC, in that said Mrs. Dixon did not properly confine harbored dogs".

The return of the Dog Warden, who signed the return as constable, shows that he arrested defendant, but does not state where or when.

Defendant waived trial by jury before such justice of the peace, and permitted him to take final jurisdiction.

The dog warden of Geauga County, the state's only witness with reference to anything other than the adoption of such resolution and declaration, testified in substance that

about nine o'clock on the morning of July 5, 1946, he drove past defendant's home, saw her dogs, "three of them" on her lawn "running around", drove a short distance east thereof, immediately returned and watched to see, but did not see, any person with the dogs, which never left the premises of the defendant during the time he was watching, and didn't see whether those dogs had on collars or tags; that three or four minutes after he first returned to the Dixon home defendant's husband came out of the house and went to a barn situated on the premises, where a large dog followed him, and that two other dogs remained in the immediate vicinity of defendant's house; that shortly after nine o'clock he "was at the residence of defendant".

Defendant, an undenied licensed obedience judge of dogs, whose testimony was not disputed, testified that she was "the owner of one dog, a co or part owner of one of the other dogs, but there are three dogs at our house"; that those dogs didn't know what it meant to "go over the yard lines on either side" or to the rear of our sixty-five acre tract of land "without us", and during the five months preceding July 5, 1946, had never been on the rear thereof; that "they (the dogs in question) are never off our premises, and have never passed the lilac bush in the front of our yard, forty feet from the highway. The distance they pass is at right angles from our house to the barn, less than 200 feet. I think it is about 165 feet, I am not sure about that. You better not quote me, but it is under 200 feet and our property is 600 feet across on Mayfield". That she was not home between 9:00 and 9:15 o'clock, but about 7:30 o'clock on the morning of July 5, 1946, she allowed the dogs to leave her home for an airing "and to relieve themselves", and thereafter stood "back of the screen-door" in her "night clothing" watching the dogs, and that "the two dogs, the two springers, remained close to the screen door within a distance of I should say approximately fifty feet", and "the Gordon Setter walked down the path not more than 175 feet, I called 'Danny' and he immediately turned round and came back to me."

In response to the question asked on direct examination "each of these dogs has won valuable prizes" defendant testified "oh, Tony, they have won so many prizes they are too numerous to mention". Whereupon the prosecutor admitted that he "would just as leave have the record show they are prize dogs and anything else".

Defendant further testified that at the time "Mr. Pendleton (the dog warden) made one of his many appearances at

the place he informed me of this dog quarantine. I told him I was very well aware of the fact. In fact, my dogs are under perpetual quarantine from the time they arrive at our house until they die. Our dogs are constantly under supervision all the time, they are never out of my sight. The fact that these are well trained dogs makes it that much more important to us that we get good obedience, and when I command 'stay here' they will remain on our property; that is part of the intensive obedience training that these dogs have had."

Defendant's husband testified that defendant "let" the dogs "out for a couple of minutes * * * and they came back in, and she fed the dogs and she finally went into town, and I * * * went to the barn and took the dogs out, and sat at the barn door", "200 feet back in my yard", a (measured) distance of 200 feet from the edge of the concrete, and "the dogs were with me at the barn in the immediate vicinity, in fact, most of the time were lying along side of me, and we were there until noon, close to eleven or twelve o'clock", and "it was between that time that the dog warden made his call, came over, yes," and someone was with the dogs "when they were out on his premises".

In response to the question asked upon cross-examination, "Mr. Dixon, you say at 9:00 o'clock that the dogs were out and running loose?" defendant's husband testified "Oh no! Do you call running loose following me"; and in answer to the next question "They weren't tethered in any way?" replied "O yes, collars, definitely, with licenses, Oh, my, yes, they are never taken off"; and in response to the succeeding question "and from nine o'clock and the next fifteen minutes, you were never away from the dogs at all", responded "for the next two hours they were never away from my side"; and answered the Prosecutor's question "by being away from your side, what do you mean, the distance", stated "well, the distance from here to the car, so they were where I could see them and talk to them at all times"; and finally responded "exactly" to the question "were the dogs with you when he (the dog warden) spoke to you".

Further in response to the Prosecutor's question "you say you saw the dog warden when he drove by?" this witness was allowed to give the following answer without objection to any part thereof:—

"Apparently the dog warden had parked in front of Rybak's stand, and the girls later told me, or I heard that he had been

standing hiding behind the tree. Finally he must have given up and he went to the house and I saw him go to the front door, and he went to the front door and talked to my mother-in-law, and finally he came to the barn and talked to me".

After some discussion between counsel and the court concerning fine and costs the justice of the peace said that "* * * I think under the circumstances that if they pay the costs of prosecution I will so rule".

Defendant appealed to the court of common pleas from the court of the justice of the peace. The court of common. pleas affirmed the judgment of the justice of the peace, which apparently was that "they (the Dixons) pay the cost of prosecution".

Defendant then appealed from the judgment of the court of common pleas to this court on questions of law, and contends that the trial judge erred in overruling defendant's motion for discharge made at the close of the state's evidence, and at the close of all the evidence, and in refusing to grant defendant a new trial; and claims that the judgments of such courts. are against the manifest weight of the evidence "and the law", and that there are other errors "apparent in the record of this case" which were duly excepted to by defendant.

Counsel for the state contends that "the only question in this case is the meaning of the statutory words 'confinement of any dog or dogs on the premises of the owner' and correctly says 'there is practically no law on the subject to be found'" in Ohio. Thus we have the contentions of the respective parties in this case.

In informal opinion number 106 rendered by the Attorney General in response to the request of the Prosecutor in this case, that officer said:—

"It appears to me that an application of the ordinary meaning of the word 'confine' should furnish a ready answer to your question. The word is defined by Webster:

" 'To restrain within limits; to restrict; to limit; to bound; to shut up; to imprison; to put or keep in restraint; to inclose; to keep close; to secure; to keep in place."

"In my opinion, any means that may be adopted, whether by a fence, pen, cage, rope or chain, which prevents a dog from leaving the premises of the owner, would answer the requirement of confinement".

"The Merriam Webster", "Websters New International. Dictionary, Second Edition", 1946, defines confine to mean:—

" '2. To restrain within limits; to limit; bound; to shut up; imprison, to put or keep in restraint; to keep close; to secure; as, to confine oneself to facts; dikes confine its waters'.

'3. To restrain from going out; to compel to stay indoors etc.' "

The same authority cites restrain, immure, circumscribe, compass, incarcerate, cage as synonyms.

I am unable to find any better definition of the word "confine" in a legal dictionary than those definitions quoted from "The Merriam Webster", "Websters New International Dictionary, Second Edition" 1946.

**Sec. 5652-16 GC**, and Geauga County District Health Board's Dog Quarantine—Order or Regulation No. 1" provide not only that defendant's highly intelligent intensively trained and obedient dogs, or dogs of similar intelligence, training and traits of character, but any dog "may be permitted to leave the premises of the owner if under leash or under the control of the owner or other responsible person."

By proceeding with her defense and introducing evidence on her own behalf, defendant waived her right to rely on her original motion "for discharge", however erroneous the over-ruling of her motion by the justice of the peace might have been; and the renewal of such motion at the close of all the evidence, challenged, not the sufficiency of the evidence that was alone before the trial court at the time the original motion was made, but the evidence and the state of the record as it existed at the conclusion of all the evidence, which in our opinion did not present a question for the justice of the peace sitting as a jury would have sat had the case been tried to such a body. See **Halkias, Appellee, v Wilkoff Co., Appellant, 141 Oh St 139, syllabus 3.**

The justice of the peace should have sustained defendant's motion for discharge renewed at the conclusion of all the evidence, but erroneously failed to do so, and in our opinion the judgment following the finding against defendant was erroneously affirmed by the court of common pleas.

Assuming we are in error in holding a question was not presented for the consideration of the justice of the peace, still in our opinion the finding and judgment of the justice of the peace is clearly against the manifest weight of the evidence and contrary to law. Since counsel for defendant has not directed our attention to the other errors "apparent in the record of this case" we do not pass upon this assigned ground of error.

14

As disclosed by the law cited, testimony quoted, and evidence to which reference is made in this case it is obvious more than one reason can be stated why we arrive at the conclusion we ultimately reach in this case, but it is sufficient to say that the meager and rather unsatisfactory record of the proceedings in the court of common pleas submitted to us for review in this case discloses no evidence that either defendants' sixty-five acre farm or the triangle described by defendant in her testimony over which the dogs under her control "pass", or any other part of defendant's farm were not enclosed in such a manner as to prevent such dogs running at large.

For the reasons stated the judge of the court of common pleas erred in affirming the judgment of the justice of the peace, and therefore the judgments of those courts are reversed and final judgment is entered for defendant.

CARTER, PJ, NICHOLS, J, concur in judgment.