THE STATE OF OHIO, APPELLEE, *v.* KLINE, APPELLANT.

(No. H-82-26—Decided April 15, 1983.)

*Mr. Douglas D. MacGillivray,* for appellee.

*Mr. Russell F. Leffler,* for appellant.

HANDWORK, J. This case is before the court on appeal from a judgment of the Huron County Court of Common Pleas. The record *sub judice* reveals a disturbingly bizarre set of facts, which may be summarized as follows.

Sometime prior to December 1981, certain "targets" of a county-wide narcotics investigation threatened the life of the Huron County Assistant Prosecuting Attorney, Reese Wineman, and his family. The record indicates that one "target," and purported source of the threats, was an individual named Doug Emmons. As a result of the threats, at least two handguns were issued to Wineman by the Huron County Prosecutor's office. These guns were kept in the Wineman home.

Early in the evening of March 12, 1982, Wineman's wife, Sue Wineman, and appellant herein, Gloria Kline, decided to go out together for dinner. The two

women were good friends and had been so for a long time. On occasions, appellant had been a babysitter for the Wineman children. Appellant was also a former client of Mr. Wineman, who had represented her during her divorce. Because a new babysitter would be staying with the children, appellant brought the guns to Mrs. Wineman and suggested that they take the guns with them to avoid exposing the children and the babysitter to any danger. The guns were apparently very accessible. Mrs. Wineman testified that she told appellant to return the guns to a bedroom dresser drawer and not to bring them along. Appellant and Mrs. Wineman left the Wineman residence at about 8:45 p.m. Mrs. Wineman testified that it was her idea to go to dinner at a particular bar in Norwalk known as Byron Austin's.

Upon arriving, the two women entered an already crowded bar where they were met by the "courthouse crowd." This particular group of patrons included: the adult probation officer, Thomas Ring, and his wife; the assistant public defender, Rich Woodruff; and Carol Myers, who was Mr. Wineman's secretary. The tenor of the evening was described variously as "festive" and "party-like." Added to this atmosphere, as the record quite clearly shows, was the consumption of a rather large quantity of alcohol by this group. Appellant and Mrs. Wineman were seated around a table in the rear of the bar with Ring and his wife, Woodruff, and several other individuals.

Sometime during the bacchanal revelry, Ring kicked something underneath the table, which he later described as "metallic." Ring testified that he reached down and retrieved a woman's purse. Ring further testified on direct examination that he suspected the purse contained a gun even before he saw it; however, he was contradicted on cross-examination by a prior recorded statement made to defense counsel on May 28, 1982, in which he stated that he held up the purse and asked "jokingly" whether it contained a gun. In any event, Ring opened the purse and pulled out a .38 Smith and Wesson snub-nosed revolver. Ring was uncertain from whose purse he had taken the gun. He inquired why the gun, which he suspected belonged to Mr. Wineman, was in the purse. *Mrs. Wineman* replied that a new babysitter was staying with her children and appellant's children at the Wineman home and that "she did not want the handgun left [there]." Ring testified that he was less than satisfied with this explanation. He then placed the gun beneath his sweater between his pants and his shirt. Several people saw him do this. By his own testimony, he carried the gun on his person for approximately two and one-half hours, waiting for Mr. Wineman to arrive at the bar. (There is some indication that Mr. Wineman was expected to do so.) During this time, Mrs. Wineman "pleaded" with Ring several times to return the weapon to her. Ring refused, saying that he would keep it until Mr. Wineman arrived. At approximately 11:30 p.m., Ring and his wife decided to leave. He approached Mrs. Wineman and asked her if she and appellant intended to stay. Mrs. Wineman replied that they were leaving shortly. Ring observed two purses on the table at which they were sitting. He testified that he picked up the one he thought belonged to Mrs. Wineman and placed the gun inside it. On cross-examination, this testimony was contradicted by a prior recorded statement made to defense counsel in which Ring stated that he did not know which purse belonged to which of the two women and, more importantly, that he did not know if the purse to which he returned the gun was the same purse in which he found it. Ring and his wife then left the bar.

Sometime between 1:00 and 1:30 a.m. on March 13, Doug Emmons and his girlfriend, Kelly Taylor, entered Byron Austin's. They had been at another bar in Norwalk earlier, and Emmons had been drinking quite heavily. At this point, the

testimony of the witnesses becomes very sketchy. Apparently, both appellant and Mrs. Wineman recognized Emmons. Mrs. Wineman became frightened and went to call the police. She testified that she was apprehensive, that she feared Emmons might "do something" and that she wanted to leave. Yet, at critical points in her testimony, Mrs. Wineman stated only that she did not remember exactly what happened. She did testify, however, that at some point she went to the restroom to regain her composure. When she returned, she testified that she saw Emmons and appellant struggling or wrestling, that Emmons had his arm around appellant's neck and that the gun was in Emmons' hand. Several other witnesses corroborated this fact. There was additional testimony by several witnesses that the struggle was quickly broken up and the gun was taken from Emmons. After Emmons and appellant were separated and restrained, and after the gun was taken by a bartender, several witnesses stated that appellant said "I'll kill him." Emmons' girlfriend, Taylor, testified that she saw appellant pull the gun from her "lap area" and point it at Emmons. Emmons, according to Taylor, quickly seized the gun from appellant and said, "She tried to kill me — call the cops." No other prosecution witness testified to this statement.

Emmons and appellant were taken to the Norwalk police station. Appellant was described as "hysterical," "crying" and "upset." She was not questioned. Emmons gave a written statement of the incident to Captain DeWalt.

On April 21, 1982, the Huron County Grand Jury returned a three-count indictment charging appellant with theft of a firearm, carrying a concealed weapon, and felonious assault. The case came on for trial on July 27, 28 and 29, 1982. The jury subsequently returned a verdict finding appellant not guilty of theft of a firearm, but guilty of felonious assault and carrying a concealed weapon. The trial court thereafter sentenced appellant to a term of imprisonment, from which this appeal has been taken.

Appellant's first and second assignments of error are as follows:

"I. The trial court erred in refusing to allow defense Exhibit A into evidence or to allow counsel to ask other questions to attack the credibility of Mr. Emmons.

"II. The trial court erred in overruling defendant's motion for acquittal pursuant to Rule 29 as to the felonious assault count and the verdict as to that count was against the manifest weight of the evidence."

In support of her first assignment of error, appellant argues that the trial court prejudicially erred in excluding Doug Emmons' written statements and in sustaining objections to the cross-examination of Captain DeWalt concerning the contents of those statements. By contrast, the state argues, first, that Emmons' written statements were inadmissible hearsay and, second, that his hearsay declaration, to which Taylor testified, was not inconsistent with his subsequent written statements. For the following reasons, we find the state's position untenable.

Though under subpoena, Emmons was unavailable as a witness at the time of trial.[1] However, Kelly Taylor testified that after Emmons wrested the gun from appellant's grasp, he said to a bartender,

---

[1] Quite mysteriously, Emmons was unavailable as the state's complaining witness. The record does not satisfactorily indicate what efforts were made to produce him or why those efforts proved fruitless. Cf. *Barber* v. *Page* (1968), 390 U.S. 719, 722-725, and *State* v. *Diehl* (1981), 67 Ohio St. 2d 389, 394 [21 O.O.3d 244]. Emmons apparently fled the jurisdiction. We also note that he was under indictment at the time of trial. He was charged with three counts of aggravated drug trafficking. The record does indicate, however, that after appellant's trial, but before sentencing, Emmons was arrested in Norwalk and brought to trial on the charges for which he was indicted.

"She tried to kill me — call the cops." These facts present a textbook issue involving hearsay testimony, one which demonstrates both the dangerous nature of this class of evidence and the overarching necessity to alleviate any unfairness created by its admission. The issue implicates the federal Constitution tangentially, in terms of the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. See *Ohio* v. *Roberts* (1980), 448 U.S. 56, 62-66; *Pointer* v. *Texas* (1965), 380 U.S. 400; cf. *State* v. *Earley* (1975), 49 Ohio App. 2d 377 [3 O.O.3d 447], as well as Section 10, Article I, of the Ohio Constitution. See *State* v. *Madison* (1980), 64 Ohio St. 2d 322, 330-331 [18 O.O.3d 491]. However, the constitutional issues were neither raised nor argued by the parties and are, in any event, unnecessary to the disposition of the case.

Emmons' statement, to which only Taylor testified, was made out of court and was offered by the state for the truth of what it asserted. In short, the statement was pristine hearsay. See Evid. R. 801 (C). This hearsay statement, however, was properly received in evidence as an exception to the rule against hearsay under Evid. R. 803(2), which provides for the admission of "excited utterances." See *State* v. *Duncan* (1978), 53 Ohio St. 2d 215 [7 O.O.3d 380]; *Potter* v. *Baker* (1955), 162 Ohio St. 488 [55 O.O. 389]; *State* v. *Lasecki* (1914), 90 Ohio St. 10; *State* v. *Dickerson* (1977), 51 Ohio App. 2d 255 [5 O.O.3d 377]. Being admissible under Evid. R. 803(2), Emmons' statement became *substantive evidence*.

Defense counsel then sought to impeach Emmons' credibility by juxtaposing to the hearsay declaration his written statements made shortly thereafter at the Norwalk Police Station. The written statements consisted of the following:

"Gloria Cline [*sic*] pulled a gun on me, I took it away, and the cops came. I lost my hat."

The trial court excluded the writing on the ground that the written statements were "hearsay." Yet, these statements were clearly not hearsay. The writing was offered not as substantive evidence, but rather to impeach the credibility and veracity of a hearsay declarant (Emmons). Consequently, the writing was *not* offered to prove the truth of the statements contained therein. Evid. R. 801(C). Extrajudicial statements offered for impeachment purposes are not hearsay since they are not offered for the truth of what they state. See McCormick, Evidence (2 Ed. Cleary Ed. 1972) 67, Section 34; 3A Wigmore, Evidence (Chadbourn Rev. 1970) 995-996, Section 1018; see, also, *Potter* v. *Baker, supra; State* v. *Andlauer* (App. 1955), 71 Ohio Law Abs. 449, 453; cf. *Mahoning Natl. Bank* v. *Massachusetts Mut. Life Ins. Co.* (App. 1939), 28 Ohio Law Abs. 619, 625.

Typically, the person to be impeached by his extrajudicial statements has testified as a witness in court. The Ohio Rules of Evidence, however, provide for the impeachment of a hearsay declarant in the same manner as if he had so testified.[2] Evid. R. 806 states, in pertinent part:

"When a hearsay statement, * * * has been admitted in evidence, the credibility of the declarant may be attacked, * * * by any evidence which would be admissible for those purposes if the declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with his hearsay statement, is not subject to any requirement that he may have been afforded an opportunity to deny or explain. * * *"

Simply stated, the rule is that when a witness testifies in court to the admissible

---

[2] Early Ohio cases established the proposition that once the statement of an unavailable hearsay declarant has been admitted in evidence, the declarant's credibility and veracity may be attacked in the same manner as with any other witness. *United States Ins. Co.* v. *Wright* (1878), 33 Ohio St. 533, 535-536.

hearsay statements of a third-party declarant, that declarant's inconsistent statements (prior or subsequent) may be admitted for impeachment purposes. See McCormick, *supra,* at 74, Section 37; 3A Wigmore, *supra,* at 651, Section 884.

Two interrelated purposes are served by this rule. First, the party against whom the hearsay declaration was admitted should in fairness be allowed to impeach the declarant with his prior or subsequent statements inconsistent with the statement admitted in evidence. Second, the rule embodies a desire to minimize the dangers against which the hearsay rule protects. In this case, Emmons was the purported "victim" of a felonious assault. His absence from trial effectively precluded confrontation and cross-examination. Although the statement to which Taylor testified was admissible under Evid. R. 803(2), due to the circumstantial guarantees of trustworthiness thought to be embodied in that class of declarations, the jury was left to accept the damaging hearsay at "face value." The jury was not given an opportunity to view Emmons' demeanor or to see his credibility and veracity tested under cross-examination. Evid. R. 806, to some degree, alleviates this disadvantage.[3]

The state contends that Emmons' "excited utterance," when juxtaposed to his subsequent written statements, is not inconsistent. This contention is devoid of merit for two reasons. First, Emmons' statements at the Norwalk Police Station shortly after the incident *omitted* any reference to any attempt by appellant to kill him. If appellant did attempt to kill Emmons, then this was a material fact which, under the circumstances, would

have been natural and reasonable for him to assert in the writing. See 3A Wigmore, *supra,* at 1056-1058, Section 1042. As a prerequisite to admitting prior or subsequent statements for impeachment purposes, the proponent must satisfy a threshold inconsistency requirement. In Ohio, the rule is a liberal one with respect to establishing inconsistency. The threshold inconsistency requirement is met if a statement offered for impeachment can be interpreted in either of two ways, though only one interpretation is actually inconsistent with the testimony of the witness sought to be impeached. Here, this requirement was fully satisfied, for Ohio law recognizes contradiction by reference to a material fact omitted in a witness's prior or subsequent statement. See *Lake Shore & Michigan So. Ry. Co.* v. *Vogelson* (1902), 3 Ohio C. C. (N.S.) 581, 587-588; *Hunt* v. *Caldwell* (1901), 22 Ohio C. C. 283, 289; see, also, *Spaulding* v. *Toledo Consolidated Street Ry. Co.* (1900), 20 Ohio C. C. 99.

By omitting a material fact, the subsequent written statement thereby contradicted the prior excited utterance to which Taylor testified. Secondly, whether the inconsistency actually *impeaches or otherwise discredits* the declarant is a question of weight for the jury. This rule is well-established. See *Dilcher* v. *State* (1883), 39 Ohio St. 130. In the *Dilcher* case, the Ohio Supreme Court articulated the rule[4] as follows:

"* * * [If the subsequent, written statement] is susceptible of different meanings, one of which would be inconsistent with the truth of such [in-court] testimony, it is admissible in evidence, leaving the jury to determine which is the

---

[3] We observe that Federal Evid. R. 806, which is identical to Ohio Evid. R. 806, has been interpreted in a similar manner by the federal courts. We find persuasive the reasoning contained in their decisions so interpreting the rule. See, *e.g., United States* v. *Wuagneux* (C.A. 11, 1982), 683 F. 2d 1343, 1357-1358.

[4] There are some contexts in which, for constitutional reasons, the rule set forth in *Dilcher* v. *State* (1883), 39 Ohio St. 130, may be limited. See *State* v. *Sabbah* (Nov. 19, 1982), Sandusky App. No. S-82-15, unreported, at 15-17.

true meaning, and to exclude such evidence is error." (*Id.* at paragraph four of the syllabus.)

Accordingly, the trial court erred in excluding Emmons' written statements as "hearsay" and in not allowing cross-examination by defense counsel into those statements. Inasmuch as the trial court received in evidence Emmons' hearsay statement through Taylor's testimony, it committed error prejudicial to appellant by excluding Emmons' inconsistent written statements offered to impeach him. Reversal is therefore required. Appellant's first assignment of error is well-taken.

In support of her second assignment of error, appellant argues that the trial court erred in refusing to grant her motion for a judgment of acquittal with respect to the charge of felonious assault. Such a motion is to be granted if reasonable minds could not conclude differently from the evidence presented that each essential element of the offense has been proven beyond a reasonable doubt. *State* v. *Bridgeman* (1978), 55 Ohio St. 2d 261 [9 O.O.3d 401]; *State* v. *Bronaugh* (1980), 69 Ohio App. 2d 24 [23 O.O.3d 23]. Stated differently, the motion challenges the prosecution's *prima facie* case and its purpose is to test the legal sufficiency of the evidence.[5] *Dayton* v. *Rogers* (1979), 60 Ohio St. 2d 162, 163 [14 O.O.3d 403]. The grounds for granting a judgment of acquittal are strongest when there is a failure to prove an element essential to the offense. The motion is also properly granted if the trial court determines that the evidence adduced in support of the state's case fails to attain " 'that high degree of probative force and certainty which the law demands to support a conviction.' " *State* v. *Goodin* (1978), 56 Ohio

St. 2d 438, 442 [10 O.O.3d 533]; *State* v. *Urbaytis* (1951), 156 Ohio St. 271 [46 O.O. 139]. While appellate courts are cautioned, appropriately, against improvidently reversing jury verdicts in criminal cases, *State* v. *Eley* (1978), 56 Ohio St. 2d 169 [10 O.O.3d 340], neither should "an appellate court * * * abdicate its responsibility to enter a judgment of acquittal when the evidence is legally insufficient to sustain a conviction." *State* v. *Goodin, supra,* at 442. In determining whether appellant's motion should have been granted, our analysis of the evidence focuses not upon its weight or credibility, which are ordinarily matters for the jury, but rather its *quantitative sufficiency* to establish beyond a reasonable doubt each element of the offense.

R.C. 2903.11 provides, in pertinent part:

"(A) No person shall knowingly:

"* * *

"(2) Cause or *attempt to cause physical harm* to another by means of a deadly weapon * * *." (Emphasis added.)

At trial, Kelly Taylor was the only prosecution witness to testify to anything in the nature of an "attempt" by appellant to shoot Emmons. Taylor testified that she saw appellant "pull a gun" on Emmons. She further stated that Emmons "immediately" grabbed the weapon from appellant, at which point the pair began struggling or "wrestling." During the scuffle, Taylor threw a glass of wine on appellant, apparently trying to divert her attention. On cross-examination, Taylor further testified that appellant had the gun pointed at Emmons for approximately "two seconds." Taylor never testified that appellant pulled the gun's trigger, or tried to do so, or that appellant cocked the hammer backwards or other-

---

[5] A *prima facie* case is presented, and thus a motion for a judgment of acquittal properly denied, when, standing unrebutted, there is a *sufficient quantum of proof* of *each* element of an offense from which reasonable minds can

conclude differently with respect to whether those elements have been proven beyond a reasonable doubt. Crim. R. 29(A); *State* v. *Bridgeman* (1978), 55 Ohio St. 2d 261 [9 O.O.3d 401].

wise attempted to fire the gun at Emmons. Nor was there testimony from Taylor that appellant tried to strike Emmons with the gun. No other prosecution witness observed the incident in as much detail, and most testified that they only observed Emmons and appellant struggling, with Emmons holding the gun. In particular, Richard Woodruff testified that Emmons was holding the gun when he (Woodruff) assisted another person in separating appellant from Emmons. Dan Ely testified that he did not observe any gun-pointing, but only saw Emmons and appellant "wrestling." Thomas Tracht, a bartender, testified that he saw Emmons holding the gun. He further testified that appellant tried to grab the gun from Emmons, while they struggled, but that Emmons pointed the gun downward. Tracht eventually took the gun away from Emmons. Another bartender, Dan Fairfax, testified that when he first observed the gun, it was in Emmons' hand. He further testified that several other people were grabbing for it before it was finally taken away by Tracht. In short, none of the state's witnesses, apart from Taylor, testified to any facts which might have even remotely established the crucial second element of felonious assault, to wit: an attempt to cause physical harm. From our review of the record, we conclude that Taylor's testimony was simply insufficient to establish that second element.

In support of its position, the state has cited the case of *State* v. *Tate* (1978), 54 Ohio St. 2d 444 [8 O.O.3d 441]. However, we find the state's reliance on the *Tate* case misplaced. In that case, the Ohio Supreme Court did not explicitly consider the exact issue raised here, namely, whether there is sufficient evidence of the second element of the offense. The *Tate* court dealt primarily with the meaning of the phrase "deadly weapon or dangerous ordnance."[6]

In establishing the second element of felonious assault, an attempt to cause physical harm, the prosecution bears the burden of proving beyond a reasonable doubt that the defendant did some overt act, some substantial but ineffectual concomitant movement, directed toward executing or accomplishing the assault through the use of a deadly weapon. While appellant's conduct clearly constituted aggravated menacing,[7] see R.C. 2903.21, there was insufficient evidence presented to show, *prima facie,* that appellant in fact *attempted* to cause physical harm to Emmons. Without such evidence, appellant's motion for a judgment of acquittal on the count of felonious assault should have been granted at the close of the state's case-in-chief. The trial court erred in so overruling that motion. Thus, appellant's second assignment of error, as heretofore construed on the basis of insufficiency of the evidence, is well-taken.[8]

---

[6] In his dissent, Justice (now Chief Justice) Celebrezze addressed the precise issue of an attempt to cause physical harm. The defendant in the *Tate* case had pointed an unloaded gun at a police officer. He was subsequently convicted of felonious assault. Justice Celebrezze concluded, from the record, that the defendant "* * * did not in fact cause physical harm, and did not commit a *direct ineffectual act* toward that result." (Emphasis added.) *State* v. *Tate* (1978), 54 Ohio St. 2d 444, 447 [8 O.O.3d 441]. Given the facts *sub judice,* we are persuaded that the Chief Justice's analysis of the second element properly focuses upon the "attempt" concept as requiring at least some proof of "a

direct ineffectual act" toward consummating the offense.

[7] Aggravated menacing, as specified in R.C. 2903.21, is *not* a lesser included offense within felonious assault. See *State* v. *Beaty* (1975), 45 Ohio App. 2d 127 [74 O.O.2d 137].

[8] After appellant's counsel moved for (and the trial court denied) a judgment of acquittal at the close of the prosecution's case-in-chief, he elected to proceed with the defense's case-in-chief. Ordinarily, by presenting a defense and introducing evidence, rather than standing upon the court's denial of his motion, a defendant waives any right to rely on that denial as

Appellant's third assignment of error is as follows:

"III. The trial court committed plain error in its instruction of law as to carrying a concealed weapon."

As a preliminary matter, we observe that appellant's third assignment of error was not raised by way of objection below, though it was assigned and briefed in this appeal. The record clearly reveals that counsel for appellant did not object to the court's instruction on the law against carrying a concealed weapon. Generally, an appellate court may decline to review an error which, though assigned and briefed on appeal, was not raised by way of objection or otherwise in the lower court. Under Crim. R. 30, a failure to lodge a timely objection to an instruction of law precludes a party from assigning as error the giving of that instruction. See Crim. R. 30; *State* v. *Williams* (1977), 51 Ohio St. 2d 112 [5 O.O.3d 98]. However, the Ohio Rules of Criminal Procedure provide for an exception. Crim. R. 52(B) states:

"(B) Plain Error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

In *State* v. *Wolery* (1976), 46 Ohio St. 2d 316 [75 O.O.2d 366], certiorari denied (1976), 429 U.S. 932, the Ohio Supreme Court intimated that an appellate court may invoke the plain error rule under Crim. R. 52(B) to review an assertion of error when the ends of justice require it. In discussing the basis for the rule, the Supreme Court stated:

"The rule's purpose is to *safeguard the right of a defendant to a fair trial,* notwithstanding his failure to object in timely fashion to error at that trial." (Emphasis added.) *Id.* at 327.

In *State* v. *Long* (1978), 53 Ohio St. 2d 91 [7 O.O.3d 178], the Supreme Court held, in part:

"Notice of plain error under Crim. R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus.

Because plain error is not easily or readily definable, each case must be considered on its own facts. *State* v. *Clayton* (1980), 62 Ohio St. 2d 45, 47 [16 O.O.3d 35]. An appellate court must carefully and thoroughly examine the record to deter-

error on appeal. *State* v. *DeBoe* (1977), 62 Ohio App. 2d 192, 194 [16 O.O.3d 467]; *State* v. *DeCamillo* (1961), 86 Ohio Law Abs. 432, 437-438 [16 O.O.2d 364]; see, also, *Dayton* v. *Rogers* (1979), 60 Ohio St. 2d 162, 163 [14 O.O.3d 403]; cf. *State* v. *Collins* (1977), 60 Ohio App. 2d 116, 125 [14 O.O.3d 94]. However, if the defendant, at the close of *his evidence,* renews his motion for acquittal, an appellate court reviewing error predicated on insufficiency of the evidence will consider the record *as a whole. State* v. *DeCamillo, supra; State* v. *Dixon* (App. 1947), 51 Ohio Law Abs. 8.

Here, counsel for appellant *did not* renew his motion for acquittal at the close of the defense's case-in-chief, but simply rested. Cf. *State* v. *Houser* (1942), 73 Ohio App. 115, 132 [28 O.O. 209]. Counsel for the state of Ohio, who was the prosecutor at trial, did not bring this deficiency to our attention in his appellate brief. Having thoroughly reviewed the record

in this case, we conclude that: (1) the presentation of appellant's case-in-chief did not supply proof of the element essential to and missing from the state's *prima facie* case, to wit: an *attempt* to cause physical harm; and (2) notwithstanding counsel's failure to renew his motion for acquittal, the court's denial of that motion when made at the close of the state's evidence was *plain error* under Crim. R. 52(B). As noted in the text of the opinion *sub judice,* an appellate court may invoke Crim. R. 52(B) when the ends of justice require it — when the error is plain and substantial rights are thereby affected. Since, as we have said, the court erroneously denied counsel's motion for acquittal, and since appellant's evidence did not supply any proof of the missing element, her conviction on the charge of felonious assault must be reversed and she must be ordered discharged. See *State* v. *Larry* (1975), 44 Ohio App. 2d 92 [73 O.O.2d 73].

mine "the probable impact of [the error and] whether substantial prejudice may have been visited on the defendant, thereby resulting in a manifest miscarriage of justice." *State* v. *Adams* (1980), 62 Ohio St. 2d 151, 154 [16 O.O.3d 169]. We conclude that our review of the trial court's action is not precluded by appellant's deficiency in urging at that time the error she now assigns in this appeal. For the reasons stated below, the trial court's error was of such magnitude as to be plain and palpable error prejudicial to appellant's substantial rights, in particular, her right to a fair trial. Crim. R. 52(B); *State* v. *Wolery, supra; State* v. *Long, supra.*

Appellant correctly maintains that the trial court's instruction on carrying a concealed weapon erroneously amplified on the model instruction contained in 4 O.J.I. 523.12. After delivering that portion of its instruction substantially comporting with the O.J.I. Instruction, the trial court continued as follows:

"A person *has possession when she knows* that the weapon is within easy reach for her use. The weapon is concealed if it is so situated as not to be seen or visible by other persons near at hand. The Defendant must know that the weapon is present and within easy reach and that *it is concealed from the view of other persons.* You must determine from all the evidence whether at the time in question *the Defendant actually knew the weapon was present* and that *it was concealed from other persons' view [sic]*." (Emphasis added.)

This additional language was clearly error. R.C. 2923.12 states, in part, as follows:

"(A) No person shall knowingly carry or have, *concealed on his person or concealed ready at hand,* any deadly weapon or dangerous ordnance." (Emphasis added.)

The gist of the offense is *knowing concealment,* not mere knowledge or mere possession. More to the point, the court's superfluous language, in addition to muddling the concept of knowing concealment, failed to stress that *appellant,* and not someone else, must be found to have done the concealing. Taken literally, the above-quoted portion of the instruction would entail that knowledge is equivalent to possession and, on these facts, any person seated at the table who saw Ring place the gun in the purse *knew* it was there, thereby "possessing" it. Ring, Mrs. Wineman and others nearby, as well as appellant, each knowing the gun was present and concealed from view, would be equally culpable. Carried to its logical conclusion, the language would necessitate culpability for anyone in close proximity to the person or thing concealing the gun, if only it were shown that they knew of the gun's presence. For example, when Ring earlier concealed the gun beneath his sweater, presumably everyone at the table who saw him do this — and the record indicates that a number of people did — would be just as culpable as the person actually doing the concealing.

The error here was only compounded further when the jury requested and the court re-read this instruction, including the erroneous portion. Since the record discloses no evidence that *appellant* concealed the gun, the jury's verdict on this charge, but for the error, might clearly have been otherwise. *State* v. *Underwood* (1983), 3 Ohio St. 3d 12. We therefore conclude that the court's instruction on the charge of carrying a concealed weapon, as delivered, was plain error under Crim. R. 52(B). Accordingly, appellant's third assignment of error is well-taken.

On consideration whereof, this court finds that the defendant-appellant, Gloria Kline, was prejudiced and prevented from having a fair trial, and the judgment of the Huron County Court of Common Pleas is hereby reversed. Pursuant to App. R. 12(B), we now render the judgment that the trial court should have rendered, to wit: As to the charge of

felonious assault, the judgment of said court being reversed, appellant is ordered discharged. See R.C. 2953.07 and 2945.15. As to the charge of carrying a concealed weapon, the judgment of said court being reversed, this case is remanded for further proceedings according to law. Costs assessed against appellee state of Ohio.

*Judgment reversed and cause remanded.*

RESNICK and DOUGLAS, JJ., concur.

DOUGLAS, J. I concur in the opinion and judgment of the majority as to the first and second assignments of error. I concur in judgment only as to the third assignment of error and express concern with some of the language used by the majority. I concur in the syllabus.