OPINION
{¶ 1} In November 2001, defendant-appellant, James Dynamite Bass, was indicted on one count of murder with a firearm specification, in violation of R.C. 2903.02. Appellant filed a motion to dismiss based upon pre-indictment delay and a motion to suppress his September 24, 2001 and October 3, 2001 statements. The trial court overruled both motions.
 {¶ 2} After a jury trial, appellant was found guilty and sentenced to 15 years to life incarceration and a mandatory 3-year sentence for the firearm specification. Appellant filed a notice of appeal and raises the following assignments of error:
 {¶ 3} "First Assignment of Error:
 {¶ 4} "The trial court erred when it admitted the tape recorded statements of witnesses who did not testify at trial, and were not declared to be unavailable, in violation of the Confrontation Clause of the Sixth Amendment to the United States and Ohio Constitutions.
 {¶ 5} "Second Assignment of Error:
 {¶ 6} "The trial court erred when it denied Appellant's Motion to Suppress the September 24, 2001 and October 3, 2001 statements which were made while under the control of law enforcement personnel, in violation of the Fifth and Sixth Amendments to the United States and Ohio Constitutions.
 {¶ 7} "Third Assignment of Error:
 {¶ 8} "The trial court committed error when it denied Appellant's Motion to Dismiss due to Pre-Indictment Delay.
 {¶ 9} "Fourth Assignment of Error:
 {¶ 10} "The trial court committed error and plain error in permitting the State of Ohio to continually refer to the Appellant as a "Blood" gang member and to admit evidence regarding Appellant's alleged gang activity and drug use, in violation of Ohio Rules of Evidence 403 and 404.
 {¶ 11} "Fifth Assignment of Error:
 {¶ 12} "The trial court erred in upholding the jury's guilty verdict which was against the manifest weight of the evidence in that there was insufficient evidence to show that Appellant purportedly caused the death of Miles Davis.
 {¶ 13} "Sixth Assignment of Error:
 {¶ 14} "Appellant was denied effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution when defense counsel: permitted continual reference to Appellant's alleged gang activity; failed to explore exculpatory evidence; stipulated to the admission of Jermaine Dickerson's taped statements in violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution; failed to move to suppress Appellant's September 11, 1999 statements; and failed to request the Court to provide a Jury Instruction on the lesser included offense of Manslaughter."
 {¶ 15} The charge arose out of a shooting which occurred on September 11, 1999, at approximately 2:40 a.m. at the Shell gasoline station located at 1509 Lockbourne Road. Both appellant and the decedent, Miles Davis, were struck by bullets. The forensic pathologist who testified determined that Davis died as a result of a gunshot wound to his chest, with injury to his liver, his inferior vena cava and right lung, in addition to internal bleeding.
 {¶ 16} The first witness to testify for the state was Columbus Police Officer Todd Schiff, who had responded to the Shell gasoline station at approximately 2:42 a.m. Schiff was one of the first officers to arrive and found a chaotic scene with people running around and attempting to leave. He initially saw that a Ford Bronco had crashed into a telephone pole and he spoke to Larry Parks at the Bronco. Schiff described Parks as frantic.
 {¶ 17} Schiff then found appellant, who had been shot, in the yard of 1483 Lockbourne Road and tried to secure the scene. After doing so, he again spoke with Parks. On cross-examination, Schiff explained that Parks initially told him that shots were fired and that Don Martin had been a shooter.
 {¶ 18} Columbus Police Officer Christopher Tussing testified that he stopped a black Honda because it crossed the center line, squealed its tires and was traveling at a high rate of speed. Jermaine Dickerson was driving the car and the passenger, the decedent Miles Davis, was bleeding from the abdominal area. Another officer drove the car and Davis to the hospital while Tussing interviewed Dickerson. Tussing described Dickerson as "agitated, really energetic, you know, you have security; kind of in hysterical type mood." (Tr. Vol. III, at 71.) Dickerson stated: "They shot my boy Dirt," but did not indicate who had shot Davis. (Tr. Vol. III, at 73.) Dirt was Davis' street name.
 {¶ 19} Keith Jackson, who is assigned to the crime scene search unit, processed the crime scene on September 11, 1999, as well as another crime scene at the same location in January 2000. In January 2000, the crime scene search unit collected an assault rifle and a 9mm Luger INTRATEC handgun ("TEC-9").
 {¶ 20} Darrell Farr testified that he was currently incarcerated for five counts of drug trafficking and criminal gang activity. He was not a gang member but associated with members of the Bloods gang. Farr testified that, on September 11, 1999, he left the D R bar at approximately 2:30 a.m. and went to the Shell station on Lockbourne Road. There were approximately 30 people present at the gas station. He saw Davis and appellant exchanging words and Davis pulled out a gun. Farr testified that Davis held the gun at his side and did not point it at anyone. Appellant walked back to his car and pulled a gun out and fired three shots towards Davis. Davis attempted to run to his car and shots were fired from Davis' area. Then appellant fired approximately three more shots. Farr did not see appellant fire his gun in the air. On cross-examination, Farr testified that, after the first three shots were fired, he ducked and ran to the back of the building but was still looking at everything happening.
 {¶ 21} Carlotta Butler testified that she knows appellant from the neighborhood. On September 11, 1999, Carlotta, along with her sister Benay and a friend named Sam, went to the D R bar and then to the Shell gas station. There were approximately 50 people at the gas station. About seven minutes after she arrived, she saw appellant shoot approximately three shots. She stated gunshots were returned and she saw appellant fire three or four more shots. She did not see appellant fire his gun in the air. On cross-examination, she stated that she saw Jermaine Dickerson at the gas station that night but did not see him fire a gun. She did not see what was happening when the shooting started, as her back was to the scene. When the shooting started, Carlotta, Benay and Sam were attempting to leave with Sam driving the car, and Carlotta looked behind them to check if Sam could back up the vehicle. While looking backwards, she saw appellant fire a gun.
 {¶ 22} Columbus Police Criminalist Mark Hardy testified that he examined shell casings that had been recovered from the crime scene at 1509 Lockbourne Road on September 11, 1999. There were three .380 shell casings which were all fired from the same class of weapon but he could not say they were all fired from the same weapon because they did not have individual characteristics to make such a determination. Likewise, he could not exclude the shell casings from being fired from the same weapon. The remaining shell casings were 9mm Luger casings. Ten of these shell casings, although different brands of ammunition, had the same class characteristics and the same individual characteristics, and Hardy concluded they were fired from the same weapon.
 {¶ 23} Five other 9mm shell casings, which are at issue here, were recovered and apparently these had been fired from yet another gun as they were not fired from the same weapon as the ten 9mm Lugar shell casings nor from the .380 weapon. These five shell casings were TCW brand ammunition and had the same class characteristics and some of the same individual characteristics, but Hardy could not determine if they were fired from the same weapon. Likewise, he could not exclude them from being fired from the same weapon.
 {¶ 24} After the TEC-9 weapon was recovered in January 2000, Hardy was asked to test that weapon. Hardy determined that the TEC-9 could not be excluded as having fired the bullet taken from Davis' body and that the bullet was consistent with TCW ammunition, the same brand as the five 9mm shell casings. Hardy stated that the bullet taken from Davis' body was consistent with a bullet that could have come from the TEC-9 and could not have been fired from the other 9mm gun that was fired on September 11, 1999, and which fired the other ten shell casings. However, Hardy also stated that the weapon that fired the .380 shell casings could have fired the bullet recovered from Davis' body, but the bullet recovered from Davis' body was "inconsistent with the .380 shell casings." (Tr. Vol. IV, at 86.)
 {¶ 25} Police Detective James Garrett testified that he interviewed appellant at approximately 4:00 a.m. at Grant Hospital on September 11, 1999, and again at approximately 8:30 that evening. Appellant had been shot and was medicated. A tape of the second interview was played for the jury. Appellant stated that he went to the D R bar and then to the Shell station. There were probably 50 people at the gas station. Some men were arguing near his car and he started to run away and was shot. He heard approximately 10 to 11 gunshots but he did not have a gun.
 {¶ 26} Homicide Detective Edward Kallay testified next. He stated that he was part of a task force that was involved in investigating unsolved homicides that were gang-related. He met appellant in May 2001, at the prosecutor's office because appellant had information about unsolved homicides. Appellant cooperated with the prosecutor and helped in the investigation of the Deuce Deuce Bloods gang which ended in the arrest of approximately 50 individuals. Appellant had information that led to the arrest of another individual and helped the narcotics division by purchasing narcotics from two individuals. He was videotaped during a deposition that was used against the individuals from whom he had purchased the narcotics from and the videotape was sold in music stores on the east side of Columbus. After that, appellant and his family received threats.
 {¶ 27} Kallay testified that, on September 24, 2001, appellant told detectives that he had a TEC-9 on September 11, 1999, and that Jermaine Dickerson had shot him. He had also told them that the TEC-9 that he possessed was recovered by the police on January 9, 2000. On October 3, 1999, appellant told the lead detective that he had fired a gun in the air on September 11, 1999.
 {¶ 28} Homicide Detective Daniel McGahhey testified that he interviewed Larry Parks on September 11, 1999, at the Shell station. The audiotape of the interview was played for the jury. In the tape, Parks stated that two men had a confrontation at the gas station. It was a fight between the Bloods and the Crips gangs. In the interview, Parks stated that he would be able to recognize faces of the shooters if he saw them but he did not know their names.
 {¶ 29} The decedent's cousin, Anthony Forrest, testified that he saw Jermaine Dickerson and another person arguing. He heard one gunshot and ducked. Forrest did not remember seeing appellant at the gas station. He did not see who Dickerson was arguing with nor did he see anyone firing a gun, but he heard approximately 10 shots. Dickerson told Forrest that appellant shot Davis.
 {¶ 30} The trial court then instructed the jury that they would hear and see a tape of the police interview of Jermaine Dickerson on September 11, 1999, but the tape was not offered by either side for the truth of what was said but, rather, simply to demonstrate inconsistent statements. On the tape, Dickerson stated that he and Davis went to the D R bar and then to the Shell station. People started arguing and Dickerson went to the cashier window to buy cigars and cigarettes. When Dickerson returned to the car, Davis had been shot and Dickerson started to drive him to the hospital. Dickerson stated that when he was at the hospital, he heard that appellant had also been shot. In the tape of the second interview on October 12, 1999, Dickerson admitted that he had had one fight with appellant at the Shell station.
 {¶ 31} Appellant had a certified arms instructor testify concerning TEC-9 semiautomatic weapons, who stated that, in his experience, a TEC-9 operates erratically.
 {¶ 32} Finally, appellant testified in his own defense. Appellant stated that he intended to buy gasoline that night and started talking to Carlotta and Benay. He saw Dickerson arguing with another individual and saw Dickerson with a gun. Appellant went back to his car and grabbed his TEC-9 and attempted to fire it twice into the air but it only fired once because the gun jammed. Appellant was attempting to calm the situation. Dickerson turned and fired at appellant and appellant began to run. He testified he did not point his gun at Dickerson and did not attempt to shoot anyone. While running away, appellant was shot in the back of the left thigh. He testified that he did not shoot Davis. At the conclusion of the trial, appellant was found guilty of murder.
 {¶ 33} By the first assignment of error, appellant contends that the trial court erred when it admitted the tape recorded statements of a witness who did not testify at trial and was not declared to be unavailable, in violation of the Confrontation Clause of theSixth Amendment to the United States and Ohio Constitutions. Appellant contends the admission of two statements was error.
 {¶ 34} The first statement appellant contends that the trial court erred by admitting into evidence is the recorded interview of Larry Parks. During cross-examination of Columbus Police Officer Todd Schiff, appellant's counsel elicited the information that Parks told Schiff that Don Martin was the shooter. Parks was interviewed later that day by the homicide detectives and stated that he did not know the names of the shooters but could probably identify them by their faces. The state then played the recorded interview of Parks to demonstrate an inconsistent subsequent statement since Parks had initially identified Don Martin as a shooter and later indicated he did not know the names of the shooters. Appellant contends that the admission of this taped interview violated the Confrontation Clause of the Sixth Amendment to the United States and Ohio Constitutions because Parks did not testify at trial and was not declared to be unavailable.
 {¶ 35} Parks' original statement that Don Martin was a shooter was admitted through the testimony of Officer Schiff because the trial court determined that it was an excited utterance. Pursuant to Evid.R. 803(2), a statement relating to a startling event made while the declarant is under the stress of excitement caused by the event is admissible as an excited utterance, which is an exception to the hearsay rule. The trial court then admitted the tape of Parks' interview pursuant to Evid.R. 806, which provides, as follows:
 {¶ 36} "(A) When a hearsay statement * * * has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence that would be admissible for those purposes if declarant had testified as a witness.
 {¶ 37} "(B) Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain."
 {¶ 38} Thus, the trial court admitted the tape of Parks' interview to attack Parks' credibility because he made inconsistent statements. Appellant argues that Parks' credibility was not subject to attack and that the trial court confused Evid.R. 801 concerning prior inconsistent statements, which is only applicable to declarants who testify at trial and are subject to cross-examination.
 {¶ 39} In State v. Kline (1983), 11 Ohio App.3d 208, 211-212, the court stated the rule as follows:
 {¶ 40} "* * * [T]he rule is that when a witness [in this case, Officer Schiff] testifies in court to the admissible hearsay statements of a third-party declarant [in this case, Parks' excited utterance], that declarant's inconsistent statements (prior or subsequent) may be admitted for impeachment purposes. * * *"
 {¶ 41} The court continued, at 212, and explained the two purposes of this rule:
 {¶ 42} "* * * First, the party against whom the hearsay declaration was admitted [the state] should in fairness be allowed to impeach the declarant [Parks] with his prior or subsequent statements inconsistent with the statement admitted in evidence. Second, the rule embodies a desire to minimize the dangers against which the hearsay rule protects. * * *"
 {¶ 43} In Kline, at 211, the court stated that extrajudicial statements offered for impeachment purposes are not hearsay since they are not offered for the truth of what they state. See, also, Knowles v. The Ohio State University, Franklin App. No. 02AP-527, 2002-Ohio-6962. Since the evidence is not hearsay, appellant's right to confrontation was not violated. State v. Shields (Jan. 11, 1989), Summit App. No. 13630, citing Ohio v. Roberts (1980), 448 U.S. 56, 66.
 {¶ 44} Thus, the trial court did not err in admitting the taped interview of appellant pursuant to Evid.R. 806. The evidence was admissible and did not violate appellant's confrontation rights.
 {¶ 45} Appellant also contends that the trial court erred in admitting the hearsay statement of Jermaine Dickerson, which was elicited through Anthony Forrest's testimony. Appellant contends admission of the following testimony was error:
 {¶ 46} "Q. Any of those people that were excited or upset, did they tell you if they saw what happened?
 {¶ 47} "MR. OWEN: Objection.
 {¶ 48} "THE COURT: Overruled.
 {¶ 49} "A. The people that I talked to was people that was with me. And they, you know, same thing. They just heard gunshots, got in the car and we, you know, left.
 {¶ 50} "Q. And anybody at the hospital that was, of those you can see the people that were upset or anything, did they ever tell you if they saw who shot your cousin?
 {¶ 51} "MR. OWEN: Objection.
 {¶ 52} "THE COURT: Overruled.
 {¶ 53} "A. Jermaine Dickerson was there at the hospital.
 {¶ 54} "Q. Was he excited?
 {¶ 55} "A. Yeah, he was in the back of the police car though. You know, he told us that Dynamite [appellant] shot Miles.
 {¶ 56} "Q. Okay. Jermaine Dickerson told you that Dynamite [appellant] shot Miles?
 {¶ 57} "MR. OWEN: Objection. Move to strike. Absolutely inappropriate." (Tr. Vol. V, at 82-83.)
 {¶ 58} Just as Parks' original statement that Don Martin was a shooter was admitted as an excited utterance, this evidence concerning Dickerson's statement was also properly admitted as an excited utterance pursuant to Evid.R. 803(2). The trial court has broad discretion in the admission or exclusion of evidence and, in the absence of an abuse of discretion which results in material prejudice to a defendant, an appellate court should be slow to reverse evidentiary rulings. Krischbaum v. Dillon (1991), 58 Ohio St.3d 58, 66. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 59} The testimony appellant contends was improperly admitted, was actually admissible pursuant to Evid.R. 806 and 803(2). Appellant's first assignment of error is not well-taken.
 {¶ 60} By the second assignment of error, appellant contends that the trial court erred when it denied appellant's motion to suppress his statements made on September 24, 2001 and October 3, 2001. Appellant contends that the statements were made while he was under the control of law enforcement personnel and in violation of the Fifth andSixth Amendments to the United States and Ohio Constitutions. Upon appellate review of a motion to suppress, while this court is "bound to accept the trial court's findings of fact which are supported by competent, credible evidence, we must independently determine as a matter of law, without deference to the trial court's conclusions, whether the findings of fact satisfy the appropriate legal standard." State v. Goins (Oct. 22, 1998), Franklin App. No. 98AP-266.
 {¶ 61} In Miranda v. Arizona (1966), 384 U.S. 436, the United States Supreme Court held that the prosecution may not use statements stemming from custodial interrogation unless it is demonstrated that procedural safeguards were used to protect the privilege against self-incrimination. The duty to advise a defendant of Miranda rights does not attach until questioning rises to the level of a custodial interrogation. In Miranda, at 444, the court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." "A person is considered in custody for purposes of Miranda when he is placed under formal arrest or his freedom of action is restrained to a degree associated with a formal arrest." (Emphasis sic.) State v. Simpson, Franklin App. No. 01AP-757, 2002-Ohio-3717, at ¶ 33, citing Minnesota v. Murphy (1984),465 U.S. 420, 434. "In judging whether an individual has been placed into custody the test is whether, under the totality of the circumstances, a `reasonable person would have believed that he was not free to leave.'" State v. Gumm (1995), 73 Ohio St.3d 413, 429, quoting United States v. Mendenhall (1980), 446 U.S. 544, 554.
 {¶ 62} The statement that appellant made on September 24, 2001, was made after appellant had gone to the prosecutor's office. Appellant was not provided with Miranda warnings. At that time, Detective Kallay questioned appellant concerning the incident on September 11, 1999. Appellant told Detective Kallay that the gun recovered on January 9, 2000, was the TEC-9 that appellant shot in the air on September 11, 1999.
 {¶ 63} Detective Kallay testified that appellant waived his right to have an attorney present during the October 3, 2001 interview which took place at police headquarters. Appellant testified that he did not waive that right and that he stated that he did not want to give a statement. Defendant's Exhibit E is a videotape of the interview. Appellant arrived in handcuffs but they were removed for the interview. Detective Kallay attempted to read appellant his rights but appellant wanted to discuss the charges first. The rights waiver was discussed and the audio portion of the tape is silent for a few seconds but clearly appellant refused to sign the rights waiver. Detective Kallay told appellant the important thing was that appellant understood his rights, not that the waiver was signed. Then Detective Kallay and appellant continued to talk and appellant gave a statement.
 {¶ 64} The trial court found that the September 24, 2001 statement was not a custodial investigation and that, while the October 3, 2001 statement was a custodial interrogation, appellant's rights were not overborne and the statement was given voluntarily.
 {¶ 65} The September 24, 2001 statement was not a custodial interrogation. Appellant was not placed under formal arrest. In fact, he arrived for a meeting with his probation officer and then met with the prosecutor and police detective. Under the totality of the circumstances, a reasonable person would have believed that he was free to leave and, in fact, appellant did leave after the interview. Thus, the trial court did not err in refusing to suppress the statement.
 {¶ 66} A defendant's refusal to sign a waiver form is not conclusive that his waiver was involuntary. State v. Scott (1980),61 Ohio St.2d 155, 161. In North Carolina v. Butler (1979), 441 U.S. 369,373, the United States Supreme Court stated that "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel * * * is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case."
 {¶ 67} The October 3, 2001 statement was a custodial interrogation. Appellant arrived in handcuffs and was told he was being charged with murder; however, even though appellant refused to sign the rights waiver, he indicated to the detective that he understood his rights as they discussed each one. Appellant continued to talk even after he refused to sign the waiver. Appellant's rights were not overborne and the statement was given voluntarily. The trial court did not err in refusing to suppress the October 3, 2001 statement. Appellant's second assignment of error is not well-taken.
 {¶ 68} By the third assignment of error, appellant contends that the trial court erred when it denied his motion to dismiss due to pre-indictment delay. The shooting incident occurred on September 11, 1999, and appellant was indicted on November 2, 2001, over two years later. Appellant claims the delay prejudiced him in two ways: (1) witnesses who would have testified on appellant's behalf, including "Walker" and Larry Parks, could no longer be found; and (2) exculpatory witnesses were afraid to testify after appellant and his family received threats when appellant cooperated with the police.
 {¶ 69} In State v. Luck (1984), 15 Ohio St.3d 150, the Supreme Court of Ohio stated that, where a defendant moves to dismiss an indictment and presents evidence establishing substantial prejudice resulting from pre-indictment delay, the prosecution bears the burden of producing evidence of a justifiable reason for the delay. In State v. Dawson (Dec. 11, 2001), Franklin App. No. 00AP-1052, this court stated that an extended delay is not per se prejudicial, nor is speculative prejudice sufficient.
 {¶ 70} Lakesia Fuller testified for appellant and stated that people would not testify on appellant's behalf after the videotape of his deposition was distributed. An assistant prosecutor testified and stated that the TEC-9 gun that appellant used was not recovered until January 9, 2001. On September 24, 2001, appellant told the detectives that the gun recovered on January 9, 2001, was the gun he had used. Thus, the link between the gun and appellant was not known until the fall of 2001. Police Detective Kallay testified that he interviewed Kendle Mardis a week before the September 24, 2001 interview with appellant, and Mardis told Kallay that appellant fired the gun that killed Davis. He also stated that, before September 2001, there were no witnesses that told the police that appellant was involved.
 {¶ 71} In State v. Woods (June 16, 1988), Franklin App. No. 87AP-736, this court cited United States v. Jenkins (C.A.10, 1983),701 F.2d 850, rejected on other grounds, for the proposition that the absence of witnesses is insufficient to constitute a showing of actual prejudice, rather, the defendant must be able to show in what specific manner missing witnesses would have aided his defense to establish actual prejudice. Appellant identified two witnesses who were no longer available to testify, "Walker" and Parks; however, Parks' statement concerning Don Martin as the shooter was admitted into evidence and appellant did not specify the evidence "Walker" could provide. Given that the prosecution produced evidence of a justifiable reason for the delay and appellant did not specify prejudice to him, the trial court did not err in overruling appellant's motion to dismiss due to pre-indictment delay. Appellant's third assignment of error is not well-taken.
 {¶ 72} By the fourth assignment of error, appellant contends that the trial court erred and plain error occurred in permitting the prosecution to continually refer to appellant as a "Blood" gang member and to admit evidence regarding appellant's alleged gang activity and drug use, in violation of Evid.R. 403 and 404. As stated above, the trial court has broad discretion in the admission or exclusion of evidence and, in the absence of an abuse of discretion which results in material prejudice to a defendant, an appellate court should be slow to reverse evidentiary rulings. Krischbaum.
 {¶ 73} Appellant's counsel did not object to most of the evidence concerning gang members so he has waived all but plain error. Although generally a court will not consider alleged errors that were not brought to the attention to the trial court, Crim.R. 52(B) provides that the court may consider errors affecting substantial rights even though they were not brought to the attention of the trial court. "`Plain error is an obvious error * * * that affects a substantial right.'" State v. Yarbrough, 95 Ohio St.3d 227, 244, 2002-Ohio-2126, at ¶ 108, quoting State v. Keith (1997), 79 Ohio St.3d 514, 518. An alleged error constitutes plain error only if the error is obvious and, but for the error, the outcome of the trial clearly would have been different. Yarbrough, at 244-245. "Notice of plain error is taken with utmost caution only under exceptional circumstances and only when necessary to prevent a manifest miscarriage of justice." State v. Martin, Franklin App. No. 02AP-33, 2002-Ohio-4769, at ¶ 28.
 {¶ 74} Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." When the evidence concerning gang membership is relevant, it is admissible. See State v. Dixon (Dec. 5, 2000), Franklin App. No. 98AP-626.
 {¶ 75} While there were repeated references to appellant being a gang member or associating with gang members, the evidence was relevant to the prosecution's theory that the shooting was the result of gang activity. In fact, the gang references were relevant to the defense as well because appellant testified that he became a gang member to help the police. In defense counsel's opening statement, he mentioned that appellant was a former gang member. The trial court gave an instruction that such gang related evidence was not to be considered to determine whether appellant committed the acts charged in the indictment. The jury is presumed to follow instructions given by the court. Pang v. Minch (1990), 53 Ohio St.3d 186, paragraph four of the syllabus. Appellant has not demonstrated an abuse of discretion in admitting the evidence. Appellant's fourth assignment of error is not well-taken.
 {¶ 76} By the fifth assignment of error, appellant contends that the trial court erred in upholding the jury's guilty verdict which was against the manifest weight of the evidence in that there was insufficient evidence to show that appellant caused the death of Davis. The test for whether a judgment is against the manifest weight of the evidence involves a limited weighing of the evidence by the court to determine whether there is sufficient, competent, credible evidence which could convince a reasonable trier of fact of appellant's guilt beyond a reasonable doubt. State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387, unreported (1993 Opinions 5437). In State v. Thompkins (1997),78 Ohio St.3d 380, 387, the Supreme Court of Ohio described the standard of review, as follows:
 {¶ 77} "* * * Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on the weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis added.) Black's [Law Dictionary (6 Ed. 1990)], at 1594.
 {¶ 78} In this case, Hardy, the criminalist, testified that all of the shell casings collected at the Shell station on September 11, 1999, were either 9mm or .380. Fifteen of the shell casings were 9mm shell casings, ten of which were fired from the same weapon. The bullet that was recovered from Davis' body was consistent with a bullet that could have come from appellant's TEC-9 gun. While the weapon that fired the .380 casings could have fired the bullet recovered from Davis' body, that bullet was inconsistent with the other .380 shell casings found.
 {¶ 79} There was eyewitness testimony that appellant shot Davis. Farr testified that he saw Davis and appellant exchanging words and Davis pulled out a gun. According to Farr, although Davis held the gun at his side and did not point it at anyone, appellant walked back to his car and pulled a gun out and fired three shots towards Davis. Davis attempted to run to his car and shots were fired from Davis' area. Then appellant fired approximately three more shots. Farr did not see appellant fire his gun in the air.
 {¶ 80} Carlotta Butler also testified that she saw appellant shoot approximately three shots. She stated there was return gunshots and she saw appellant fire three or four more shots. She also did not see appellant fire his gun in the air.
 {¶ 81} Finally, Anthony Forrest testified that he saw Jermaine Dickerson and another person arguing. He heard one gunshot and ducked, and then he heard approximately ten shots. Forrest testified that Dickerson told him that Dynamite shot Davis.
 {¶ 82} Given this evidence, there was sufficient, competent, credible evidence which could convince a reasonable trier of fact of appellant's guilt beyond a reasonable doubt. Appellant's fifth assignment of error is not well-taken.
 {¶ 83} By the sixth assignment of error, appellant contends that he was denied effective assistance of counsel as guaranteed by theSixth Amendment to the United States Constitution when defense counsel: permitted continual reference to appellant's alleged gang activity; failed to explore exculpatory evidence; stipulated to the admission of Jermaine Dickerson's taped statements in violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution; failed to move to suppress appellant's September 11, 1999 statements; and failed to request the trial court to provide a jury instruction on the lesser included offense of manslaughter.
 {¶ 84} In order to demonstrate that his counsel's representation was ineffective, appellant must demonstrate that: (1) counsel's performance was deficient; and (2) this deficient performance prejudiced the defense. Strickland v. Washington (1984), 466 U.S. 668, 687. "A defendant does not state a claim for ineffective assistance of counsel unless his attorney acted unreasonably given the facts of the case, and the unreasonable conduct was prejudicial to the defense." State v. Mills (1992), 62 Ohio St.3d 357, 370, certiorari denied, Mills v. Ohio (1992),505 U.S. 1227. Counsel need not raise meritless issues. State v. Hill (1996), 75 Ohio St.3d 195.
 {¶ 85} We have already determined that the trial court did not err in permitting the references to appellant's alleged gang activity or in the admission of Jermaine Dickerson's taped statements, thus, trial counsel was not ineffective in this regard. Appellant also contends that counsel failed to explore exculpatory evidence in that the testimony of Anthony Forrest indicated he heard one gunshot fired before the onslaught of bullets which was consistent with appellant's testimony that he fired one shot in the air before Dickerson started firing at him. After Forrest testified, defense counsel requested the opportunity and time to listen to the tapes of the Forrest interview to determine whether or not there were inconsistent statements. The jury was dismissed for the rest of the day. The next morning, defense counsel advised the court that he would release Forrest from his subpoena. A reasonable conclusion to be drawn from the record before the court is not that defense counsel was incompetent and failed to investigate exculpatory evidence, but, rather, the evidence was not exculpatory.
 {¶ 86} Appellant also contends that defense counsel failed to investigate the whereabouts of Larry Parks. Although appellant contended in assignment of error number three that the pre-indictment delay prejudiced him because Parks could not be located for trial, there is no evidence in the record regarding the whereabouts of Parks. There was no finding that he was unavailable and, given the lack of evidence, we cannot determine that counsel was ineffective.
 {¶ 87} Appellant also contends that defense counsel was ineffective for failing to move to suppress appellant's September 11, 1999 statements. Appellant was interviewed twice on September 11, 1999, both times while in the hospital. As stated above, the duty to advise a defendant of Miranda rights does not attach until questioning rises to the level of a custodial interrogation. Appellant was not under arrest or in custody. There was no basis for filing a motion to suppress these statements and counsel was not ineffective for failing to do so.
 {¶ 88} Finally, appellant contends that counsel was ineffective for failing to request the trial court to provide a jury instruction on the lesser included offense of manslaughter. Given appellant's testimony that he only fired one shot into the air and did not fire a shot at Davis, we cannot say counsel was ineffective for failing to request a manslaughter instruction. Thus, appellant's sixth assignment of error is not well-taken.
 {¶ 89} For the foregoing reasons, appellant's six assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
KLATT and McCORMAC, JJ., concur.
McCORMAC, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution