[Cite as *State v. Potts*, 2016-Ohio-5555.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                  CASE NO.  5-16-03

      v.

KEVIN J. POTTS,                        O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Hancock County Common Pleas Court
Trial Court No. 2015CR171

**Judgment Affirmed**

Date of Decision:   August 29, 2016

APPEARANCES:

    *Kristopher K. Kill*  **for Appellant**

    *Elizabeth H. Smith* **for Appellee**

**PRESTON, J.**

**{¶1}** Defendant-appellant, Kevin J. Potts ("Potts"), appeals the January 21, 2016 judgment entry of sentence of the Hancock County Court of Common Pleas. For the reasons that follow, we affirm.

**{¶2}** This case stems from a June 25, 2015 altercation between Potts and the victim, John Shepard ("John"), in which Potts was alleged to have appeared at John's house and attempted to assault John with a gun by entering the house and pointing the gun at him. Potts was motivated to confront John after Potts's girlfriend, Lori Welly ("Welly"), alleged that John, a corrections officer with the Hancock County Sheriff's Office, raped her while she was an inmate at the Hancock County Justice Center in the fall of 2014. Welly was released from the Justice Center in September 2014 and told Potts that John raped her while she was an inmate. As a result of Welly's statement, Potts twice called John, and Potts and Welly went to John's house on September 29, 2014 to confront John. Welly later pled no contest to providing false information during an official investigation concerning her report about the rape and was sentenced to 90 days in jail, with 85 of those days suspended. As a result of her sentence, Potts decided that he needed to confront John before Welly was to serve her sentence at the Hancock County Justice Center.

{¶3} On June 30, 2015, the Hancock County Grand Jury indicted Potts on two counts, including: Count One of aggravated burglary in violation of R.C. 2911.11(A)(2) and 2903.11(D)(1)(a), a first-degree felony, and Count Two of felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony. (Doc. No. 1). Both counts of the indictment included a specification under R.C. 2941.145 alleging that Potts committed the offenses with a firearm. (*Id.*).

{¶4} On July 8, 2015, Potts appeared for arraignment and entered pleas of not guilty. (Doc. No. 4).

{¶5} On September 24, 2015, Potts filed a request for a bill of particulars, which the State filed on September 29, 2015. (Doc. Nos. 59, 60).

{¶6} The State filed a motion on December 3, 2015 requesting Welly to be called as the court's witness. (Doc. No. 94). The next day, the State filed a motion in limine to exclude Potts from introducing any evidence from John's personnel file and a motion for a jury view. (Doc. Nos. 95, 96). At trial, the trial court granted the State's motions for a jury view and for Welly to be called as the court's witness. (Dec. 7-10, 2015 Tr., Vol. I, at 7, 9). Regarding the State's motion in limine, the trial court concluded that Potts could conduct a limited inquiry as to John's credibility based on his personnel file. (Dec. 7-10, 2015 Tr., Vol. III, at 549).

{¶7} The State filed amended bills of particulars on December 7 and 9, 2015. (Doc. Nos. 97, 102).

{¶8} The case proceeded to a jury trial on December 7-10, 2015. On December 10, 2015, the jury found Potts guilty as to the counts and specifications in the indictment. (Doc. Nos. 104, 105); (Dec. 7-10, 2015 Tr., Vol. IV, at 811-813). The trial court filed its judgment entry of conviction on January 21, 2016. (Doc. No. 114). That same day, the trial court sentenced Potts to seven years in prison on Count One, seven years in prison on Count Two, and three years in prison on the specification on Count One, and ordered that Potts serve the terms consecutively for an aggregate sentence of 17 years. (Doc. No. 116); (Jan. 21, 2016 Tr. at 28-29). The parties stipulated that the specifications in Counts One and Two of the indictment merged, and the trial court merged the specifications. (Doc. No. 116).

{¶9} On February 11, 2016, Potts filed his notice of appeal. (Doc. No. 121). He raises five assignment of error for our review. For ease of our discussion, we discuss Potts's third assignment of error first, followed by his first, second, fourth, and fifth assignments of error.

## Assignment of Error No. III

**The Trial Court erred in overruling the motion for acquittal pursuant to Crim.R. 29.**

{¶10} In his third assignment of error, Potts argues that the trial court erred by overruling his Crim.R. 29 motion for acquittal. Specifically, Potts argues that his felonious-assault conviction is based on insufficient evidence—namely, that

there is insufficient evidence that he knowingly attempted to cause John physical harm.

{¶11} "Under Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Tatum*, 3d Dist. Seneca No. 13-10-18, 2011-Ohio-3005, ¶ 43, citing *State v. Bridgeman*, 55 Ohio St.2d 261, 263 (1978). "A motion for acquittal tests the sufficiency of the evidence." *Id.*, citing *State v. Miley*, 114 Ohio App.3d 738, 742 (4th Dist.1996).

{¶12} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997), fn. 4. Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v.*

*Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

**{¶13}** The criminal offense of felonious assault is codified in R.C. 2903.11, which provides, in relevant part: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon * * *." R.C. 2903.11(A)(2).

**{¶14}** At trial, the State offered the testimony of Deputy Terrill Brooks ("Deputy Brooks") and Sergeant Michael Cortez ("Sergeant Cortez") of the Hancock County Sheriff's Office regarding the September 29, 2014 incident. (Dec. 7-10, 2015 Tr., Vol. II, at 251-252). First, Deputy Brooks testified that, on that date, he responded to a trespassing complaint made by John against Potts. (*Id.* at 253-254, 257). He testified that he initiated a traffic stop of Potts and Welly in response to John's complaint. (*Id.* at 255-257, 260). According to Deputy Brooks, Potts admitted to him that he and Welly went to the Shepard residence, and admitted that he had a gun in his vehicle behind the driver's seat. (*Id.* at 262-263).

**{¶15}** Second, Sergeant Cortez testified that he assisted with the September 29, 2014 traffic stop of Potts. (*Id.* at 269, 271-275). According to Sergeant Cortez,

Potts admitted that he and Welly were coming from the Shepard residence and that Potts took the gun "for protection." (*Id.* at 278-281). He testified that Potts told him that he took the gun for protection because Welly told Potts that John sexually assaulted her while she was an inmate at the Hancock County Justice Center. (*Id.* at 282). However, Sergeant Cortez testified that Potts told him that he left the gun in his car while he was at the Shepard residence. (*Id.*). According to Sergeant Cortez, John and John's wife, Kim Shepard ("Kim"),

> were not wanting to do anything, as far as pursue any type of criminal charges, or anything like that. However, they did want a criminal trespass warning issued to [Potts and Welly], and that if they had returned, they would then file charges for said crime.

(*Id.* at 282-283). Sergeant Cortez testified that he "verbally gave [the criminal trespass warning] to [Potts]," and testified that trespass warnings do not expire. (*Id.* at 283-284).

{¶16} On cross-examination, Sergeant Cortez testified that neither Potts nor Welly threatened anyone on September 29, 2014. (*Id.* at 285).

{¶17} As its next witness, the State called Detective Barry Boutwell ("Detective Boutwell") of the Hancock County Sheriff's Office who testified that he investigated Welly's complaint that John sexually assaulted her. (*Id.* at 290-291, 293-295). He testified that he was unable to substantiate Welly's claims based on

the information that she provided to him. (*Id.* at 308-310, 314-316). According to Detective Boutwell, because Welly's allegations were unfounded, Welly was charged with "providing false information during an official investigation." (*Id.* at 316-317). (*See also* State's Exs. 2, 3).

{¶18} The trial court called Welly as its witness. (*Id.* at 338, 340). On the State's examination, Welly testified that she went with Potts to the Shepard residence on September 29, 2014 "to speak with [John's] wife." (*Id.* at 350-352). According to Welly, she knew Potts had a gun in his vehicle. (*Id.* at 352). Welly testified that Kim answered the door and that Welly "asked her if she was married to John Shepard," and Welly testified that is when John came to the door. (*Id.* at 353, 356). According to Welly, she and Potts then left the Shepard residence. (*Id.* at 356).

{¶19} Welly further testified that she later pled no contest to the providing-false-information-during-an-official-investigation charge, was found guilty, and was sentenced to 90 days in jail, with 85 of those days suspended. (*Id.* at 361-362). (*See also* State's Exs. 2, 3). She testified that she was sentenced on June 25, 2015 for that crime, but was not to report to serve her jail sentence until a later date. (Dec. 7-10, 2015 Tr., Vol. II, at 362-363). According to Welly, Potts was upset by her sentence, "but he wasn't overly angry. He was concerned that [she] was serving jail time again." (*Id.* at 363).

{¶20} On the defense's examination, Welly testified that she and Potts left the Shepard residence on September 29, 2014 when they were asked to leave. (*Id.* at 367). According to Welly, neither she nor Potts threatened anyone on September 29, 2014. (*Id.*). Welly testified that she did not believe that Potts intended to cause John harm when Potts returned to the Shepard residence on June 25, 2015. (*Id.*).

{¶21} As its next witness, the State called Lieutenant Christopher Bell ("Lieutenant Bell") of the Hancock County Sheriff's Office. (*Id.* at 375-376). Lieutenant Bell identified as State's Exhibit 4 a true and accurate copy of the 911 emergency call that the Hancock County Sheriff's Office received from Kim on June 25, 2015, which was subsequently played for the jury. (*Id.* at 385-386).

{¶22} Next, the State called Deputy Matthew Brunswick ("Deputy Brunswick") of the Hancock County Sheriff's Office who testified that he responded to the Shepard residence on June 25, 2015. (*Id.* at 390, 396-398). When he arrived at the scene, he saw Potts and John "struggling right at the entrance of the base of the porch, where it meets the driveway." (*Id.* at 401-402). He testified that he saw both men with both of their hands on the gun struggling for control of it. (*Id.* at 418). He testified specifically,

> So the suspect had the gun, his hands down, I can't say exact position,
> but somewhat facing downward, and then Mr. Shepard has his hands
> both onto [sic] the firearm. So both people were struggling, and as

this is going on, they're obviously both moving around, and the gun

is, for the most part, seemed like it is pointed downward at that time.

(*Id.* at 423).

**{¶23}** According to Deputy Brunswick, when he arrived at the scene, he immediately exited his patrol vehicle and heard John yelling "he's got a gun, he's got a gun." (*Id.* at 403). As a result, Deputy Brunswick tried to find a vantage point, which would provide him a safe shot, and was yelling "drop the gun, drop the gun." (*Id.*). He testified that he yelled "drop the gun" several times. (*Id.* at 424). Deputy Brunswick testified that the scuffle between Potts and John lasted "[s]econds." (*Id.* at 403-404). According to Deputy Brunswick, Potts eventually complied with his order to drop the gun. (*Id.* at 426).

**{¶24}** Deputy Brunswick identified State's Exhibit 7 as the gun he recovered from the scene—a GLOCK 19, 9-millimeter handgun. (*Id.* at 406-407). Deputy Brunswick testified that, when he recovered the gun, he found a bullet in the chamber of the gun. (*Id.* at 408). (*See also id.* at 434). According to Deputy Brunswick, Potts admitted that "he chambered one because he didn't feel safe." (*Id.* at 436).

**{¶25}** He further testified that the magazine for the gun, which he identified as State's Exhibit 8, was located under a bench on the front porch of the Shepard residence. (*Id.* at 414). He testified that there were 9 rounds of ammunition found

in the magazine that holds 15 rounds. (*Id.* at 415). Deputy Brunswick identified as State's Exhibit 9 a photograph depicting the magazine as it was discovered on the Shepard's front porch. (*Id.* at 414). (*See* State's Ex. 9). (*See also* State's Exhibit 10). Deputy Brunswick identified as State's Exhibit 11 a knife that was discovered on Potts at the scene. (Dec. 7-10, 2015 Tr., Vol. II, at 429-430). (*See also* State's Ex. 12).

{¶26} He testified that Potts appeared to be intoxicated and that Potts stated "[n]ot enough" when Deputy Brunswick asked him how much alcohol he had consumed. (Dec. 7-10, 2015 Tr., Vol. II, at 439). Deputy Brunswick identified State's Exhibit 13 as a true and accurate photograph of the location at which Potts parked his vehicle in relation to the Shepard residence—down the street and several residences to the west from the Shepard residence. (*Id.* at 440-441, 443). Deputy Brunswick identified State's Exhibits 15, 16, 17, and 18 as true and accurate photographs depicting the injuries John sustained. (*Id.* at 446-449).

{¶27} On cross-examination, Deputy Brunswick testified that he saw only that the gun was pointed downward at John's legs during the struggle, and he testified that he did not hear Potts verbally threaten John. (*Id.* at 458).

{¶28} On re-cross examination, Deputy Brunswick testified that, when he arrived at the scene, he observed Potts holding the gun in a position that would allow him to discharge it. (*Id.* at 462).

**{¶29}** Detective Sergeant Jason Seem ("Detective Seem") testified for the State that he responded to the scene on June 25, 2015 to assist in the investigation. (*Id.* at 510). Detective Seem identified State's Exhibit 20 as a diagram that he created depicting the scene. (*Id.* at 510-511).

**{¶30}** On cross-examination, Detective Seem testified that no one reported to him that Potts threatened John or that Potts pointed the gun at John. (*Id.* at 528). He also testified that the Shepards' front doors were not inspected for fingerprint evidence to substantiate whether Potts touched either door. (*Id.*).

**{¶31}** As its next witness, the State called John, who testified as to his interactions with Potts on September 28 and 29, 2014 and June 25, 2015. (Dec. 7-10, 2015 Tr., Vol. III, at 554, 558, 564, 584). He testified that, on September 28, 2014, he received a phone call from Potts asking him if he was a corrections officer with the Hancock County Justice Center, and asking him whether he knew Welly. (*Id.* at 558-561). He testified that the phone disconnected after Potts asked John whether he knew Welly but that Potts called again shortly thereafter; however, he did not answer Potts's second call. (*Id.* at 562). As part of the second call, Potts left a voicemail identifying himself and asking John to return his call. (*Id.* at 562-563). As a result of Potts's phone calls, John reported the phone calls to the Hancock County Sheriff's Office. (*Id.* at 563).

{¶32} John testified that Potts and Welly appeared at his residence the next day. (*Id.* at 564). He testified that Potts parked "on the far side of the driveway." (*Id.* at 570). John testified that Kim answered the door and that John later came to the door and heard Welly ask Kim whether she was married to John. (*Id.* at 567-568). John testified that Potts stated to him, "[Y]ou know what you did." (*Id.* at 568). At that time, John told Potts and Welly to leave; however, according to John, they did not initially leave and stayed on the front porch for "[p]robably 6 to 10 minutes." (*Id.* at 568-569). Because Potts and Welly did not leave John's property, he called the Hancock County Sheriff's Office. (*Id.* at 569). John testified that he applied for an order of protection against Potts the next day. (*Id.* at 570-571). John testified that an ex parte order of protection was granted but that he decided to not pursue the final order because he "was advised Mr. Potts was moving to Colorado." (*Id.* at 571-572). Instead, on November 7, 2014, John and Potts signed a "mutual agreement to avoid contact." (*Id.* at 572, 578).

{¶33} John testified that he learned on September 30, 2014 that Welly filed a complaint against him alleging that he sexually assaulted her. (*Id.* at 579-581).

{¶34} John testified that, on June 25, 2015, Potts appeared at his residence shortly after 10:00 p.m. (*Id.* at 584). John testified that he and Kim were sleeping when their barking dogs and the sound of their door bell woke them. (*Id.* at 590-591). He testified that he looked out his kitchen window to see who was at the door

and, according to John, he did not recognize that it was Potts because he was "clean-shaven" and thought that Potts was a friend of his son. (*Id.* at 592, 594).

**{¶35}** Because he didn't recognize Potts, he went to open the door, and as soon as he turned the deadbolt to the front door, he was hit in the head with the door. (*Id.* at 594-595). Potts was attempting to shove the door open, so John tried to shut the door to keep him from entering his residence while yelling, "No. No." (*Id.* at 595). According to John, he shut Potts's arm in the door at least one time and after the third time he tried to force open the door, Potts succeeded and entered John's residence "[a] foot or two." (*Id.* at 596). John testified that Potts was pointing a gun at him when he entered his house. (*Id.* at 597). Yet, he testified that Potts did not make any statement to him while he was pointing the gun at him. (*Id.* at 598).

**{¶36}** At that point, John "grabbed the gun [with both of his hands] and forced [Potts] out the front door." (*Id.*). John testified that Potts then grabbed the gun with both hands to fight back. (*Id.*). John told Potts to drop the gun, let go of the gun, and "no, no." (*Id.* at 598-599). John testified Potts did not make any statement in response to John's declarations to him; however, "[l]ater in the struggle, he told [John] that [sic] just to let go of the gun." (*Id.* at 599). According to John, Potts was "very calm." (*Id.*).

**{¶37}** Eventually, the struggle led John and Potts from the front porch to the driveway and Deputy Brunswick arrived at the scene. (*Id.* at 602-603). John

testified that Potts let go of the gun after being commanded to do so by Deputy Brunswick "at least three" times. (*Id.* at 603). John testified that he first learned of Potts's identity after asking Potts to reveal his identity while Deputy Brunswick was handcuffing Potts. (*Id.* at 604). According to John, Potts did not identify himself; rather, Potts responded to John by stating that he is "a rapist two times." (*Id.*). John further testified that after Potts called him a rapist, he "thought that must be Mr. Potts." (*Id.*).

{¶38} John testified that he sustained "an injury to [his] head, [he] had an injury to [his] feet, * * * [his] abdomen, [his] arms, * * * [and] a cut on some fingers on [his] hand." (*Id.* at 605). John identified as State's Exhibits 15, 16, 17, and 18 as true and accurate photographs depicting the injuries he sustained that night. (*Id.* at 605-608). John testified that he sought medical treatment because he "couldn't hardly talk" and was also treated for "abrasions to [his] foot, [his] legs, [his] arm, and [his] stomach," and he thought "a muscle pulled." (*Id.* at 611).

{¶39} John testified that the chain to the front screen door of his house was damaged and that a pin was broken off of the handle of the front door as a result of his altercation with Potts. (*Id.* at 587-588). (*See* State's Exs. 22, 23, 24).

{¶40} On cross-examination, John testified that, although he received training in writing incident reports for his employment as a corrections officer and was instructed by law enforcement on June 25, 2015 to write everything that

happened during the incident with Potts, he did not write in his written statement that Potts pointed the gun at him. (*Id.* at 614-621). (*See also* Defendant's Ex. A).

{¶41} As its final witness, the State called Kim to testify. (Dec. 7-10, 2015 Tr., Vol. III, at 626). Kim testified that Potts and Welly came to her residence on September 29, 2014, and when she answered the door, Welly asked her whether she was married to John to which she responded, "Yes, can I help you." (*Id.* at 629-631). Kim testified that Welly did not say anything else and that Potts did not say anything until John came to the door and then said, "You know what you did." (*Id.* at 631). According to Kim, John shut the door and locked it. (*Id.* at 632). Kim testified that Potts and Welly remained on their front porch for about five minutes. (*Id.*).

{¶42} Kim testified that, on June 25, 2015, she was awakened by her barking dogs. (*Id.* at 635-636). According to Kim, John looked out the window to see who was at the door and he said to her, "I don't know who it is." (*Id.* at 636). Because the dogs were barking, she took the dogs to a back bedroom to allow John to speak with whoever was at the door. (*Id.*). Kim testified that, while she "was putting on [her] housecoat coming out of the bedroom," John unlocked the door and she "heard a noise, as if someone had thrown themselves against the door." (*Id.* at 637). When she came out of the bedroom, she "saw [her] husband trying to keep the door closed, and a hand coming through the doorway, with what appeared to be a gun in the

hand." (*Id.* at 637-638). According to Kim, John was yelling "no, no" and told her to call 911, which she did. (*Id.* at 639-640).

{¶43} Kim testified, "John reaches up and grabs the gun. He has two hands on it. The man comes through the door, he has two hands on it. And then my husband was able to push him out the front door, and they were struggling on the front porch." (*Id.* at 641). She further testified that when Potts came through the door, he came "[a] few steps into the entranceway" of the house. (*Id.* at 642). Kim testified that she remained on the phone with the 911 dispatcher throughout the incident. (*Id.* at 643). She also testified that she reported to the 911 dispatcher that she saw "a knife, a big, long knife in a sheath hanging from * * * his belt." (*Id.* at 644). However, Kim testified that Potts did not take the knife out of the sheath on his belt. (*Id.*). Kim testified that she did not hear Potts say anything during the incident. (*Id.* at 645).

{¶44} Thereafter, the State moved to admit exhibits and rested. (*Id.* at 654-655). State's Exhibits 1-27 and 29 were admitted without objection, and State's Exhibit 28 was excluded. (*Id.* at 655). Potts moved to admit Defendant's Exhibit A, which was admitted without objection. (*Id.* at 656). Next, Potts made a Crim.R. 29(A) motion, which the trial court denied. (*Id.* at 656-660). Potts testified in his defense, and the defense rested. (*Id.* at 663, 720). The State did not present any witnesses on rebuttal, and the matter was submitted to the jury, which found Potts

guilty as to the counts and the specifications in the indictment. (*Id.* at 722, 793, 811-813).

**{¶45}** Potts challenges on appeal whether he knowingly attempted to cause John physical harm. First, in support of his argument that he did not act knowingly, Potts argues, "There was no evidence of John Shepard having a gun pointed at him in any witness statement or police report. At Trial, [sic] was the first time that that was mentioned." (Appellant's Brief at 9-10). However, as we noted above, we do not resolve evidentiary conflicts when assessing sufficiency of the evidence—that is, we examine only whether there was sufficient evidence to support each element of the offense. *See Jones*, 2013-Ohio-4775, at ¶ 33; *Berry*, 2013-Ohio-2380, at ¶ 19. In this case, the State presented sufficient evidence that Potts acted knowingly.

**{¶46}** "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). Here, the State presented sufficient evidence that Potts pointed the gun at John, which satisfies the element of felonious assault that Potts acted knowingly. *Dailey v. Warden, Madison Corr. Inst.*, S.D.Ohio No. 1:07CV643, 2008 WL 1844060, *10 (Apr. 22, 2008) ("the State presented sufficient evidence to establish that [Dailey] in fact pointed the gun at [the victim], and thus that [Dailey] acted 'knowingly' within the meaning of the

felonious assault statute"), citing *State v. Brooks*, 44 Ohio St.3d 185, 189 (1989), quoting *State v. Tate*, 54 Ohio St.2d 444, 446 (1978). Indeed, John testified that Potts pointed a gun at him as he entered John's house. (*See* Dec. 7-10, 2015 Tr., Vol. III, at 597-598). As such, viewing John's testimony in a light most favorable to the prosecution, we conclude that a rational trier of fact could conclude that Potts acted knowingly. *See Dailey* at \*11.

{¶47} Having concluded that Potts acted knowingly, we turn to the element of whether Potts attempted to cause John physical harm. In support of his argument that he did not attempt to cause John physical harm, Potts relies on *Brooks*, in which the Supreme Court of Ohio held that "[t]he act of pointing a deadly weapon at another, without additional evidence of the actor's intention, is insufficient to convict a defendant of the offense of 'felonious assault' as defined by R.C. 2903.11(A)(2)." 44 Ohio St.3d 185, at syllabus. Potts also relies on *State v. Green*, in which the Supreme Court of Ohio illuminated its holding in *Brooks* by stating "that the additional evidence needed to uphold a felonious assault charge could include verbal threats as perceived by a reasonable person under the circumstances." 58 Ohio St.3d 239, 241 (1991). Thus, the crux of Potts's argument is that because there is no evidence in the record that he verbally threatened John or any other evidence indicating his intention to attempt to cause John physical harm by means

of the gun or the knife, there is insufficient evidence that he committed felonious assault.

**{¶48}** In defining the attempt element of felonious assault under R.C. 2903.11(A)(2), the Supreme Court of Ohio borrowed from the language of an attempt crime as defined under R.C. 2323.02. Under that statute, "An attempt to commit an offense is made when a person purposely or knowingly engages in conduct that, if successful, would constitute or result in the offense." *State v. Hoffert*, 1st Dist. Hamilton No. C-020168, 2002-Ohio-6343, ¶ 9, citing R.C. 2923.02(A). "A person making a criminal attempt must make a substantial step in a course of conduct planned to culminate in the commission of the crime." *Id.*, citing *State v. Woods*, 48 Ohio St.2d 127 (1976), paragraph one of the syllabus, *overruled on other grounds*, *State v. Downs*, 51 Ohio St.2d 47 (1977). "The substantial step must be strongly corroborative of the actor's criminal purpose." *Id.*, citing *Woods* at paragraph one of the syllabus. Moreover, the Supreme Court of Ohio explained the substantial-step standard,

> "American courts have generally agreed that intent to commit a crime does not of itself constitute an attempt, nor does mere preparation. The difficulty is to formulate a standard that excludes preparations prior to an actual attempt to commit a crime, while including, as punishable, those acts which are so dangerously close to resulting in

a crime that intervention and arrest by police are justified, even before the "last proximate act." Various tests have been suggested and followed in other jurisdictions. * * * Ohio's statutory definitions of criminal offenses in the Revised Code are based largely upon the American Law Institute's Model Penal Code, and the standard adopted in the latter Code appears to us workable, reasonable, and consistent with the language of R.C. 2923.02(A). * * * The application of this standard will of course depend upon both the nature of the intended crime and the facts of the particular case. A substantial step in the commission of a robbery may be quite different from that in arson, rape, or some other crime. But this standard does properly direct attention to overt acts of the defendant which convincingly demonstrate a firm purpose to commit a crime, while allowing police intervention, based upon observation of such incriminating conduct, in order to prevent the crime when the criminal intent becomes apparent."

*Brooks* at 190-191, quoting *Woods* at 131-132.

**{¶49}** "Therefore, to prove the element of attempt to cause physical harm in this case, the state was required to prove that [Potts] did an overt act that was some substantial but ineffectual step directed towards accomplishing the physical harm

through the use of a deadly weapon." *Hoffert* at ¶ 9, citing *State v. Kline*, 11 Ohio App.3d 208, 214 (6th Dist.1983).

{¶50} "[T]here would be little doubt that a reasonable jury could convict [Potts] of felonious assault if he had pointed his [weapon at the victim] and either fired or attempted to discharge his weapon in [his] direction" or if Potts verbally threatened John while pointing the gun at him. *Hoffert* at ¶ 10, quoting *Brooks* at 192. *See also Green*, 58 Ohio St.3d at 241. However, similar to the facts presented in *Dailey*, Potts did not make any verbal threats when he pointed his gun at John; therefore, we must consider whether Potts's overt actions "convincingly demonstrate a firm purpose" to commit felonious assault that would have been achieved absent intervention to prevent the apparently immediate crime. *Dailey* at *12, citing *State v. Clark*, 8th Dist. Cuyahoga No. 58270, 1991 WL 127271, *3 (June 27, 1991), citing *Brooks* at 189-190. *See also State v. Helms*, 7th Dist. Mahoning No. 08 MA 199, 2012-Ohio-1147, ¶ 34, citing *Green* at 242. As in *Dailey*, "[t]he question is a close one." *Id.* at *13.

{¶51} In support of his argument that there is insufficient evidence that he attempted to cause John physical harm, Potts relies on *Nash v. Eberlin*, in which the United States Court of Appeals for the Sixth Circuit granted habeas relief after concluding that there was insufficient evidence that Nash committed felonious assault because "it was objectively unreasonable for the Ohio Court of Appeals to

find that a rational trier of fact could be convinced beyond a reasonable doubt that

Nash knowingly attempted to cause physical harm to anyone through the use of a

deadly weapon." 6th Cir. No. 06-4059, 2007 WL 4438008, *1, 4 (Dec. 14, 2007).

In that case,

Connie Nash ("Connie") received a call at the nursing home where she worked from her husband's, [Darell Nash, Sr. ("Nash")], girlfriend. After finishing her shift at work, Connie came home and found Nash and a friend in the Nashes' kitchen playing cards. Connie told Nash's friend to leave so that she could speak with Nash. As he was standing up, Nash bumped Connie with his chair, and she "started swinging on him." Nash got out of his chair and grabbed Connie, and they began to fight. She tripped over a highchair and fell down. The Nashes' adult son, Darell Nash, Jr. ("Darell Jr."), and their nephew, William Jeter, heard the noise and came up from the basement; they found Connie and Nash screaming at each other.

Nash ran upstairs and then returned with a .9-millimeter handgun. The handgun was loaded. Upon seeing the gun, Darell Jr. grabbed Nash, which caused the gun to fire into the ground. Connie went into the Nashes' daughter's room, and Nash followed her. Darell

Jr. again grabbed Nash, and the gun fired into the wall. Nash then put

the gun away upstairs and left the house in his car.

(Parenthetical sic.) *Id.* at *1. Nash told law enforcement that he retrieved the gun

to scare Connie. *Id.* at *2. The Sixth Circuit concluded that there was insufficient

evidence that Nash knowingly attempted to cause physical harm to anyone by means

of a deadly weapon because "the evidence in this case establishes nothing more than

that Nash brought out the gun to scare his wife, that he followed his wife into their

daughter's room on the same floor, and that the gun went off while Nash struggled

with his son." *Id.* at *4.

{¶52} In addition, Potts also relies on *Kline*, in which the Sixth District Court

of Appeals concluded that "there was insufficient evidence to show * * * that [the

defendant] * * * *attempted* to cause physical harm to [the victim]." (Emphasis sic.)

11 Ohio App.3d at 214. In that case,

At trial, Kelly Taylor was the only prosecution witness to testify to

anything in the nature of an "attempt" by appellant to shoot [the

victim]. Taylor testified that she saw appellant "pull a gun" on [the

victim]. She further stated that [the victim] "immediately" grabbed

the weapon from appellant, at which point the pair began struggling

or "wrestling." During the scuffle, Taylor threw a glass of wine on

appellant, apparently trying to divert her attention. On cross-

examination, Taylor further testified that appellant had the gun pointed at Emmons for approximately "two seconds." Taylor never testified that appellant pulled the gun's trigger, or tried to do so, or that appellant cocked the hammer backwards or otherwise attempted to fire the gun at Emmons. Nor was there testimony from Taylor that appellant tried to strike Emmons with the gun.

*Id.* at 213-214.

**{¶53}** Unlike those of Nash and Kline, Potts's actions—as testified to by the State's witnesses—sufficiently demonstrate that he intended to shoot John—that is, that Potts's actions portrayed a substantial, but ineffectual, step towards causing John physical harm with the gun. "While merely pointing a gun at another will not support a felonious-assault conviction, 'the *Brooks* holding is that the trier of fact may infer the existence of [the attempt to cause physical harm] element from the circumstances that surround, and indeed prompt, the aiming of the deadly weapon.'" *State v. Dyer*, 2d Dist. Montgomery No. 26267, 2015-Ohio-451, ¶ 1, quoting *State v. Mills*, 1st Dist. Hamilton No. C-880581, 1990 WL 203563, *5 (Dec. 12, 1990).

**{¶54}** Here, the circumstances surrounding Potts's act of pointing a gun, which had a bullet in the chamber, corroborate that Potts attempted to cause John physical harm. Even disregarding the events that took place in 2014 between Potts and John, the facts of what happened at John's front door on June 25, 2015, when

viewed in a light most favorable to the prosecution, sufficiently demonstrate Potts's intention to fire his weapon at John.

{¶55} Notwithstanding his mutual agreement to avoid contact with John, Potts decided that he needed to confront John on June 25, 2015 before Welly was to return to the jail in which John, as believed by Potts, allegedly raped her. Thus, at approximately, 10:00 p.m., Potts parked his vehicle in location that would allow him a quick escape from the Shepard residence, and knocked on the Shepard's front door while armed with a gun and a knife. Accepting the facts in a light most favorable to the prosecution, when John unlocked the deadbolt to his front door, Potts rammed the door causing it to strike John in the head. Realizing that the person on the other side of the door was trying to force entry into his house, John attempted to shut the door to prevent Potts from entering. To thwart John from closing the door, Potts stuck his arm with the gun in his hand through the door. After a scuffle over the door, Potts was able to push his way into John's house and point the gun at John—that is, Potts was using forward momentum to force open the door to move toward John while pointing at John the gun with the bullet in its chamber. *Compare State v. Ross*, 2d Dist. Montgomery No. 20031, 2004-Ohio-3093, ¶ 24 ("Ross kept the gun pointed at [Officer] Copley's chest while he attempted to close the door to the building. Officer Copley along with two other officers had to struggle against the door in order to reopen the door. While pushing against the door, Officer Copley

repeatedly ordered Ross to 'Drop the gun.' Upon having opened the door, Ross was cornered behind the door and again pointed the gun at Officer Copley's chest."); *State v. Workman*, 84 Ohio App.3d 534, 535 (9th Dist.1992) ("It may be reasonably inferred that Workman, by holding the knife in his hand, was ready to use it. Workman's step with knife in hand toward Officer Price may be reasonably interpreted to be a step toward execution of the assault.").

{¶56} Unlike the unique set of facts presented by this case, there is no evidence in *Kline* that the defendant engaged in any type of overt act "directed toward executing or accomplishing the assault through the use of a deadly weapon." 11 Ohio App.3d at 214. That is, there are no facts in *Kline* indicating that Kline exhibited any type of aggressive forward momentum while pointing the gun at the victim to execute or accomplish the assault. The facts in *Kline* reveal that Kline "pull[ed] the gun from her 'lap area' and point[ed] it at [the victim]. [Then, the victim] * * * quickly seized the gun from [Kline]." *Id.* at 210.

{¶57} Moreover, the facts of this case are also distinguishable from *Nash*. Unlike Potts's conduct, there is no evidence in *Nash* that Nash exhibited the same type of aggressive forward momentum while pointing the gun at Connie to accomplish the assault. Although the facts of *Nash* reveal that Nash "followed" Connie into their daughter's room with the gun in hand after Darrell Jr. intervened

causing the gun to fire into the ground, those facts do not portray the same overtness exhibited by Potts to execute the assault.

{¶58} Indeed, "[t]he fundamental distinction between felonious assault and aggravated menacing is whether the defendant tried to actually harm the victim, or if he merely knowingly frightened the victim." *State v. Helms*, 7th Dist. Mahoning No. 08 MA 199, 2010-Ohio-4872, ¶ 59, *rev'd on other grounds*, 128 Ohio St.3d 352, 2011-Ohio-738, citing *State v. Smith*, 9th Dist. Lorain No. 98CA007168, 2000 WL 110411, *3 (Jan. 26, 2000), citing *Brooks*, 44 Ohio St.3d at 192. In this case, Potts's conduct consisted of acts beyond merely displaying the gun. *Compare State v. Wiseman*, 12th Dist. Warren No. CA2004-06-072, 2005-Ohio-3225, ¶ 23 ("the evidence showed [Wiseman's] conduct consisted of several acts beyond the mere display of the knife and verbal threats").

{¶59} After Potts successfully shoved his way into the Shepard residence, John was able to intervene to prevent Potts from harming him with the gun by grabbing the gun with both of his hands and struggling with Potts over the gun. Potts did not let go of the gun until ordered to do so by the intervention of law enforcement. *See Ross*, 2004-Ohio-3093, at ¶ 24 (noting that, despite numerous orders to drop the gun, Ross only dropped the gun after being shot in the arm); *Workman*, 84 Ohio App.3d at 535 (noting that Workman's attempt to physically harm Officer Price was foiled when Officer Price tackled Workman). That Potts

continued to struggle for control of the gun corroborates Potts's intention to cause John physical harm. Also corroborative of Potts's intention is the fact that Potts held the gun in a position to discharge it throughout the altercation.

{¶60} Thus, under the specific facts of this case, a jury could reasonably infer that Potts attempted to seriously harm John because he forced his way into John's house while pointing a gun at John—that is, the act of using his momentum to aggressively force his way into the Shepard house to point the gun at John, and by using that momentum to move toward John while pointing the gun at him "may be reasonably interpreted to be a step toward the execution of the [felonious] assault." *Workman* at 535. Moreover, a jury could reasonably conclude that those acts demonstrate that Potts intended to harm John, not that he intended to merely frighten John. Therefore, Potts's felonious-assault conviction is based on sufficient evidence.

{¶61} Potts's third assignment of error is overruled.

### Assignment of Error No. I

**The Trial Court erred when it refused to instruct the jury on the lesser related offense of Aggravated Menacing, in violation of Ohio Revised Code section 2903.21.**

{¶62} In his first assignment of error, Potts argues that the trial court erred by refusing to allow the jury to consider the lesser-related offense of aggravated menacing under R.C. 2903.21.

**{¶63}** "In determining whether a particular offense should be submitted to the jury as a lesser-included offense, the Ohio Supreme Court has set forth a two-tiered analysis." *State v. Singh*, 3d Dist. Logan No. 8-15-04, 2015-Ohio-4130, ¶ 5, citing *State v. Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, ¶ 6.

> The first tier, also called the "statutory-elements step," is a purely legal question, wherein we determine whether one offense is generally a lesser included offense of the charged offense. * * *
>
> The second tier looks to the evidence in a particular case and determines whether "a jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense." * * * Only in the second tier of the analysis do the facts of a particular case become relevant.

*Id.*, quoting *Deanda* at ¶ 6.

**{¶64}** "A jury instruction on a lesser-included offense is only required if 'the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser included offense.'" *State v. Wine*, 3d Dist. Auglaize No. 2-12-01, 2012-Ohio-2837, ¶ 16, quoting *State v. Douglas*, 3d Dist. Marion No. 9-05-24, 2005-Ohio-6304, ¶ 20, citing *State v. Thomas*, 40 Ohio St.3d 213, 216 (1988). "As noted by the Ohio Supreme Court, when conducting this

analysis, the evidence must be viewed in a light most favorable to the defense." *Singh* at ¶ 7, citing *State v. Wine*, 140 Ohio St.3d 409, 2014-Ohio-3948, ¶ 21.

{¶65} "The trial court's decision whether to instruct the jury on a lesser included offense will not be reversed absent an abuse of its discretion." *Wine*, 2012-Ohio-2837, at ¶ 16, citing *Douglas* at ¶ 20, citing *State v. Mitchell*, 53 Ohio App.3d 117, 119-120 (8th Dist.1988). An abuse of discretion implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶66} As we noted above, the criminal offense of felonious assault is codified in R.C. 2903.11, which provides, in relevant part: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon * * *." R.C. 2903.11(A)(2). R.C. 2903.21 sets forth the offense of aggravated menacing and provides: "No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person[.]" R.C. 2903.21(A).

{¶67} As Potts concedes, "'aggravated menacing is *not* a lesser-included offense of felonious assault.'" (Emphasis added.) *State v. Taylor*, 10th Dist. Franklin No. 12AP-870, 2013-Ohio-3699, ¶ 38, quoting *State v. Easley*, 10th Dist. Franklin No. 07AP-578, 2008-Ohio-468, ¶ 66 and citing *State v. Thompson*, 10th Dist. Franklin No. 97APA04-489, 1998 WL 135148, *3 (Mar. 24, 1998). Indeed,

"the entire lesser-included-offense analysis, for purposes of R.C. 2945.74, is as follows: an offense may be a lesser included offense of another only if (i) the offense is a crime of lesser degree than the other, (ii) *the offense of the greater degree cannot, as statutorily defined, ever be committed without the offense of the lesser degree also being committed*, and (iii) some element of the greater offense is not required to prove the commission of the lesser offense." (Emphasis added.) *State v. Kidder*, 32 Ohio St.3d 279, 282 (1987). "Inherent in the lesser-included-offense doctrine is the defendant's constitutional right to receive notice before trial of all charges against him." *Deanda* at ¶ 5, citing *Ex parte Bain*, 121 U.S. 1, 7 S.Ct. 781 (1887).

**{¶68}** Felonious assault, as defined by R.C. 2903.11(A)(2), can be committed without committing aggravated menacing—that is, aggravated menacing requires an offender to cause the victim to believe that the offender is going to cause him harm, whereas felonious assault can be committed without any apprehension by the victim. *See Thompson* at \*3 (finding that aggravated menacing "contains the additional element of causing apprehension, which is not contained in the crime of felonious assault. As statutorily defined, felonious assault can be committed without committing aggravated menacing."). *Compare Kidder* at 283 ("Aggravated menacing, a first-degree misdemeanor, is a crime of lesser degree than attempted murder, a first-degree felony. However, murder can be committed without the

victim's being aware of impending serious physical harm."). Therefore, a charge of felonious assault does not reasonably put the defendant on notice that he may be convicted of aggravated menacing—that is, aggravated menacing is not a lesser-included offense of felonious assault.

{¶69} Nevertheless, Potts argues that "[t]he evidence and testimony elicited at Trial required the instruction on aggravated menacing." (Appellant's Brief at 5). In support of his argument, Potts relies on *State v. Rohdes*. 23 Ohio St.3d 225 (1986). However, Potts's reliance on *Rohdes* is misplaced because the holding in that case has since been modified by Supreme Court of Ohio. *See Kidder* at 283 ("Any language in *Rohdes* which is contrary to this two-step analysis is hereby disapproved."); *Deanda* at ¶ 15, 18 (explaining that "in the aftermath of *Rohdes*" "it is essential to divorce the facts of a particular case from the statutory-elements analysis" because "the specific facts of a particular case are still irrelevant to the first step of the lesser-included-offense analysis"). *See also State v. Turks*, 3d Dist. Allen Nos. 1-10-02 and 1-10-26, 2010-Ohio-5944, ¶ 22-26 (explaining the evolution of the lesser-included-offense test).

{¶70} Accordingly, because aggravated menacing is not a lesser-included offense of felonious assault, we need not address the second tier of the lesser-included-offense analysis. *See State v. Johnson*, 3d Dist. Marion No. 9-10-47, 2011-

Ohio-994, ¶ 56. Thus, the trial court did not abuse its discretion by not instructing the jury on aggravated menacing.

{¶71} Potts's first assignment of error is overruled.

### Assignment of Error No. II

**The Trial Court abused its discretion when it would not allow further cross-examination on specific instances, pursuant to Evid.R. 608(B) and Evid.R. 404, of John Shepard's personnel file when it was clearly relevant and probative of truthfulness or untruthfulness.**

{¶72} In Potts's second assignment of error, he argues that the trial court abused its discretion by not permitting cross-examination of John's truthfulness based on information contained in his personnel file. Specifically, Potts argues that this evidence would have undermined John's testimony regarding his version of the events on June 25, 2015.

{¶73} "The Ohio Rules of Evidence clearly delineate the methods by which a party may impeach a witness' credibility." *State v. Myricks*, 2d Dist. Montgomery No. 22846, 2009-Ohio-5304, ¶ 25. "A witness' credibility may be attacked, * * * under Evid.R. 608, by evidence of the witness' character for untruthfulness." *Id.* *See also State v. Jones*, 8th Dist. Cuyahoga No. 101514, 2015-Ohio-2151, ¶ 37 ("a defendant may question a witness on cross-examination regarding prior instances of misconduct when the questioning is 'clearly probative' of the witness's character for truthfulness"), citing *State v. Moshos*, 12th Dist. Clinton No. CA2009-06-008,

2010-Ohio-735, ¶ 18 and *State v. Widmer*, 12th Dist. Warren No. CA2011-03-027, 2012-Ohio-4342, ¶ 134. Evid.R. 608 provides, in relevant part:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid.R. 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness * * *.

Evid.R. 608(B). Further, Evid.R. 611(B) provides, "Cross-examination shall be permitted on all relevant matters and matters affecting credibility."

{¶74} "Therefore, Evid.R. 608(B) permits cross-examination of a witness regarding specific instances of conduct that may have 'a clear bearing' upon the witness's truthful character and requires a 'high degree of probative value' of the prior conduct 'as to the truthfulness of the witness' before the court will allow cross-examination as to the prior conduct for purposes of attacking the credibility of the witness." *Jones* at ¶ 38, citing 1980 Staff Note, Evid.R. 608(B). "The conduct must therefore be 'clearly probative of truthfulness or untruthfulness' in order to avoid unfair prejudice, confusion of the issues, and misleading of the jury." *Id.*, citing *Widmer* at ¶ 134, citing *State v. Williams*, 1 Ohio App.3d 156, 157 (10th Dist.1981).

{¶75} "The ability of trial counsel under Evid.R. 608(B), to discredit a witness through cross examination concerning particular conduct of the witness is not absolute, it is limited in its exercise to the court's sound discretion in determining if the inquiry will lead to particular instances of conduct which are clearly probative of untruthfulness." *State v. Irizarry-Romero*, 5th Dist. Licking No. 95-CA-121, 1996 WL 488542, *2 (July 12, 1996). *See also State v. Boggs*, 63 Ohio St.3d 418 (1992), paragraph one of the syllabus; *State v. Cumpian*, 3d Dist. Henry No. 7-98-10, 1999 WL 156039, *5 (Feb. 22, 1999). As such, a reviewing court should not reverse a trial court's determination absent an abuse of discretion and material prejudice. *See State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62; *State v. Ferguson*, 5 Ohio St.3d 160, 166 (1983). As we noted above, "an abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable." *Adams*, 62 Ohio St.2d at 157.

{¶76} Further, "'[a] trial court retains "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, * * * or interrogation that is repetitive or only marginally relevant."'" *State v. Evans*, 11th Dist. Lake No. 2014-L-070, 2015-Ohio-2298, ¶ 31, quoting *State v. Minier*, 11th Dist. Portage No. 2000-P-0025, 2001 WL 1149461, *2 (Sept. 28, 2001), quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct.

1431 (1986). "'Thus, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defense might wish."'" *Id.*, quoting *Minier* at *2, quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292 (1985).

**{¶77}** In this case, the State filed a motion in limine requesting that the trial court prevent Potts from cross-examining John regarding two disciplinary actions contained in John's personnel file from his work as a corrections officer with the Hancock County Sherriff's Office. In response to the State's motion, Potts argued that the incidents contained in John's personnel file

> speak[] to [John's] credibility under [Evid.R.] 608 * * *; it speaks to his truthfulness, to him telling the truth. We have an incident where he's accused of doing an illegal strip search in the jail. Says he didn't do it, is caught red-handed in the act in camera. We have an incident where there is illegal contraband and drugs going into the jail[.]

(Dec. 7-10, 2015 Tr., Vol. I, at 11-12).

**{¶78}** We do not know the substance of either of the incidents that Potts argues that are clearly probative of John's character for truthfulness because neither is in the record.[1] Because those records are not in the record for us to review, we

---

[1] From our review of the record, it appears as though only one of the disciplinary actions about which Potts intended to cross-examine John was provided to the trial court for it to review whether the underlying incidents were clearly probative of John's truthfulness. (*See* Dec. 7-10, 2015 Tr., Vol. I, at 12-13).

cannot say that the trial court abused its discretion by prohibiting Potts's inquiry. *See Evans* at ¶ 35 (concluding that "there is nothing for us to review, and no evidence before us on which to conclude that the trial court abused its discretion" in limiting Evans's cross-examination of a law enforcement officer based on his disciplinary record because Evans "did not proffer the [disciplinary] reports"). Without having the substance of the disciplinary actions before us, we cannot presume that they are clearly probative of John's character for truthfulness—that is, we cannot rely on Potts's unsubstantiated assertions of what the underlying conduct is that led to John's discipline. *See Myricks*, 2009-Ohio-5304, at ¶ 26 ("Moreover, there is absolutely nothing on the record as to the details of the charges against [the witness], when they happened, or how this charge, per se, is 'clearly probative of truthfulness or untruthfulness' or of the witness's 'character for untruthfulness.'"), citing Evid.R. 608(B).

**{¶79}** Notwithstanding, the trial court permitted Potts latitude in questioning John concerning the disciplinary actions taken against him in his work as a corrections officer.[2] *See Williams*, 1 Ohio App.3d at 157-158. Indeed, the following exchange took place during Potts's cross-examination of John:

---

[2] By permitting this line of questioning, the trial court appears to have concluded that it was admissible after reasoning that the testimony is relevant to Potts's theory of the case. In particular, the trial court reasoned that John's personnel record is relevant to the case because "[t]he defense theory relates to his employment. The defense theory relates to claims, or lack of claims * * * of things that occurred at his employment." (Dec. 7-10, 2015 Tr., Vol. III, at 550).

[Potts's Counsel]:    You're employed as a corrections officer at the Hancock County Jail, right?

[John]:    Yes, sir.

[Potts's Counsel]:    Okay. And you've worked there for some time, correct?

[John]:    Yes, sir.

[Potts's Counsel]:    Okay. And you have been disciplined at work before, right? You've been demoted, right?

[John]:    Yes, sir.

[Potts's Counsel]:    In 2012, you were placed on administrative leave, right?

[John]:    Yes, sir.

[The Prosecutor]:    I'm going to object * * *.

* * *

[The Trial Court]:    I'm going to sustain the objection at this point. He's admitted that - - answered your question in the affirmative. That stops the inquiry.

[Potts's Counsel]:    Thank you, Your Honor.

    You lost your position as a sergeant, right?

[The Prosecutor]:    I'm going to object, Your Honor.

[The Trial Court]:    Sustained.

(*Id.* at 616-617). Accordingly, Potts was not materially prejudiced by the trial court's decision to limit Potts's inquiry into John's prior conduct.

**{¶80}** For these reasons, Potts's second assignment of error is overruled.

### Assignment of Error No. IV

**The Trial Court erred when the Prosecutor, during closing arguments, indicated his opinion as to the credibility of witnesses during the trial. The Trial Court erred by not intervening sua sponte, due to the abuse of privilege.**

**{¶81}** In his fourth assignment of error, Potts argues that the prosecutor engaged in misconduct during closing argument, which denied him a fair trial. Potts further alleges in this assignment of error that the trial court erred by failing to "intervene sua sponte" when the prosecutor made the improper remarks during closing argument. (Appellant's Brief at 10).

**{¶82}** "The test for prosecutorial misconduct during opening statements and closing arguments is whether the remarks made by the prosecutor were improper and, if so, whether they prejudicially affected a substantial right of the accused." *State v. Siefer*, 3d Dist. Hancock No. 5-09-24, 2011-Ohio-1868, ¶ 46, citing *State v. White*, 82 Ohio St.3d 16, 22 (1998). "In closing arguments, prosecutors are entitled to some latitude regarding what the evidence has shown and the inferences that can be drawn." *State v. McGuire*, 3d Dist. Allen No. 1-13-47, 2015-Ohio-1887, ¶ 81, citing *State v. Ballew*, 76 Ohio St.3d 244, 255 (1996). "'"A prosecutor may comment upon the testimony and suggest the conclusion to be drawn by it, but a

prosecutor cannot express his personal belief or opinion as to the credibility of a witness or as to the guilt of an accused, or go beyond the evidence which is before the jury when arguing for conviction.""" *State v. Johnson*, 3d Dist. Allen No. 1-13-45, 2014-Ohio-4750, ¶ 89, quoting *State v. Manns*, 5th Dist. Richland No. 08 CA 101, 2009-Ohio-3262, ¶ 20, quoting *State v. Smith*, 12th Dist. Butler No. CA2007-05-133, 2008-Ohio-2499, ¶ 7. *See also State v. Stober*, 3d Dist. Putnam No. 12-13-09, 2014-Ohio-1568, ¶ 133, citing *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 16.

**{¶83}** "'Additionally, we review a prosecutor's opening statement and closing argument in its entirety.'" *Siefer* at ¶ 46, quoting *State v. Watson*, 61 Ohio St.3d 1, 10 (1991), *abrogated on other grounds*, *State v. McGuire*, 80 Ohio St.3d 390, 686 (1997). "If, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty, even without the improper remarks, then the trial will not be deemed unfair." *Id.*, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 45, citing *State v. Treesh*, 90 Ohio St.3d 460, 464 (2001). *See also State v. Liles*, 3d Dist. Allen No. 1-14-61, 2015-Ohio-3093, ¶ 31 ("'To establish prejudice, a defendant must show that a reasonable probability exists that, but for the prosecutor's improper remarks, the result of the proceeding would have been different. Thus, "[n]ot every intemperate remark by counsel can be a basis for reversal."'"), quoting *State v. Porter*, 4th Dist. Meigs No.

10CA15, 2012-Ohio-1526, ¶ 20, quoting *State v. Landrum*, 53 Ohio St.3d 107, 112 (1990). "Again, the touchstone of this analysis "'is the fairness of the trial, not the culpability of the prosecutor."'" *Siefer* at ¶ 46, quoting *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, ¶ 140, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940 (1982).

**{¶84}** In determining whether a prosecutor's remarks were improper and if they prejudicially affected the defendant's substantial rights, "an appellate court should consider several factors: (1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." *Johnson* at ¶ 87, quoting *State v. Braxton*, 102 Ohio App.3d 28, 41 (8th Dist.1995).

**{¶85}** Potts alleges that the prosecutor impermissibly implied during closing argument that the credibility of the law enforcement officers is greater than Potts's credibility. In particular, Potts objects to the prosecutor's statement,

> [Y]ou heard the testimony of Kevin Potts. He said Detective Boutwell was wrong about that. Also now he said, also said, Deputy Brooks was wrong, Sergeant Cortez was wrong, Detective Brunswick was wrong. I think just about every investigator here got it all wrong. So consider that as well. Use your reason and common sense in considering that.

(Dec. 7-10, 2015 Tr., Vol. III, at 741-742). Potts's trial counsel did not object to the prosecutor's statements. As such, the alleged improprieties are waived, absent plain error. *State v. Smith*, 3d Dist. Hardin No. 6-14-14, 2015-Ohio-2977, ¶ 63, citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 139 and *State v. Saleh*, 10th Dist. Franklin No. 07AP-431, 2009-Ohio-1542, ¶ 68.

**{¶86}** "Crim.R. 52(B) governs plain-error review in criminal cases." *State v. Bagley*, 3d Dist. Allen No. 1-13-31, 2014-Ohio-1787, ¶ 55, citing *State v. Risner*, 73 Ohio App.3d 19, 24 (3d Dist.1991). "A court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice." *Smith* at ¶ 63, citing *Saleh* at ¶ 68. "We may reverse only when the record is clear that defendant would not have been convicted in the absence of the improper conduct." *Id.*, citing *State v. Williams*, 79 Ohio St.3d 1, 12 (1997). Accordingly, Potts must show that, absent the prosecutors' statement, the outcome of his trial would be different.

**{¶87}** The State argues that the prosecutor was summarizing Potts's testimony and not expressing his opinion as to Potts's credibility. Indeed, Potts testified that Detective Boutwell's testimony was wrong that Potts indicated to Detective Boutwell, while Detective Boutwell was interviewing Welly about the rape, that he "needed to grab a shotgun and fire off a couple rounds in the backyard" because Potts "was upset." (Dec. 7-10, 2015 Tr., Vol. III, at 699). Furthermore,

Potts testified that he did not tell Deputy Brooks that he and Welly went to the wrong house on September 29, 2014; rather, Potts testified that he told Deputy Brooks that Welly told Potts that she was not sure if the person who came to the door was John because she "couldn't see him very well." (*Id.* at 702-703). Likewise, Potts testified that Detective Cortez was "mistaken as to what was said" in response to Detective Cortez's testimony that Potts told him that John was not the person who assaulted Welly. (*Id.* at 703). Potts further testified that Deputy Brunswick's testimony that Potts told him on June 25, 2015 that Potts chambered a round because he did not feel safe was wrong because, according to Potts, he did not say that to Deputy Brunswick. (*Id.* at 711-712). Moreover, the following exchange took place during the State's cross-examination of Potts:

> [The Prosecutor]: Okay. Just so we're clear, we now have Detective Boutwell you said has been wrong, Deputy Cortez has been wrong, Deputy Brooks has been wrong, Deputy Brunswick has been wrong; is that fair?
>
> [Potts]: Deputy Brooks has been wrong?
>
> [The Prosecutor]: Well, the deputy - -
>
> [Potts]: I would say there is elements of truth to what they say, but their exact quotes of what they say that I said is not entirely accurate.

-44-

> [The Prosecutor]:  So everyone is wrong?
>
> [Potts]:  I didn't say they were wrong.  You're the one that keeps saying that.

(*Id.* at 712).

**{¶88}** Because "[i]solated comments by a prosecutor are not to be taken out of context and given their most damaging meaning," we conclude that the prosecutor's remarks are not improper.  *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, ¶ 170.  Read in context of the entirety of his closing argument, the prosecutor was summarizing the testimony regarding the timeline of events, and reminding the jury to evaluate the testimony of the investigators and Potts to decide for themselves the way in which the events unfolded.  *See id.* at ¶ 172 (concluding that the prosecutor's statements, in a trial by a three-judge panel, were not improper when read in context because the statements urged the court to weigh the evidence); *State v. Coben*, 2d Dist. Greene No. 2001 CA 8, 2002 WL 313133, * 2 (Mar. 1, 2002) (concluding that the prosecutor's remarks were not improper, in part, because the remarks were "made in the context of contrasting the defense and prosecutor witnesses, and was made prior to the prosecutor's analysis of the inconsistencies in Coben's witnesses' testimonies").  Likewise, "[t]he prosecutor did not claim to have personal knowledge of any witness' truthfulness."  *Coben* at *2.

{¶89} Further, even if the prosecutor's comments were improper, Potts failed to show that a reasonable probability exists that, but for the prosecutor's improper remark, the result of his trial would have been different. That is, while the prosecutor was pointing out inconsistencies between the investigators' and Potts's testimony and asking the jury to asses that evidence, there remained the testimony of John and Kim relating to the charges to which Potts faced. Stated differently, the prosecutor's comments related to evidence other than the evidence necessary to prove the elements of felonious assault and aggravated burglary. *See State v. Williams*, 1st Dist. Hamilton No. C-040747, 2005-Ohio-6772, ¶ 28 (concluding that, even if the prosecutor misstated the evidence presented during trial during his closing argument, there was an "array of evidence presented" of Williams's guilt); *State v. Bell*, 12th Dist. Clermont No. CA2008-05-044, 2009-Ohio-2335, ¶ 92 ("while the prosecutor's comments were arguably improper, the record contains ample evidence in support of appellant's conviction"). Moreover, the trial court instructed the jury that closing arguments are not evidence, and "we must presume that the jury followed the trial court's instructions." *State v. Vanlon*, 12th Dist. Butler No. CA2008-10-259, 2009-Ohio-4461, ¶ 38, citing *State v. Woodard*, 68 Ohio St.3d 70, 76 (1993) and *Bell* at ¶ 85. (*See* Dec. 7-10, 2015 Tr., Vol. III, at 728). As such, the prosecutor's comments do not amount to plain error.

{¶90} Potts further argues that the trial court erred by failing to sua sponte intervene in response to the prosecutor's comments. However, because we determined that the prosecutor's comments do not rise to the level of prosecutorial misconduct that deprived Potts of a fair trial, we need not address this argument.

{¶91} Potts's fourth assignment of error is overruled.

**Assignment of Error No. V**

**The Trial Court erred by failing to merge the Aggravated Burglary and Felonious Assault convictions, at sentencing, as they occurred as part of the same transaction and both were borne of the same animus.**

{¶92} In his fifth assignment of error, Potts argues that the trial court erred by failing to merge his aggravated burglary and felonious assault convictions.

{¶93} Whether offenses are allied offenses of similar import is a question of law that this court reviews de novo. *State v. Stall*, 3d Dist. Crawford No. 3-10-12, 2011-Ohio-5733, ¶ 15, citing *State v. Brown*, 3d Dist. Allen No. 1-10-31, 2011-Ohio-1461, ¶ 36.

{¶94} R.C. 2941.25, Ohio's multiple-count statute, states:

(A) Where the same conduct by defendant can be construed to

constitute two or more allied offenses of similar import, the

indictment or information may contain counts for all such offenses,

but the defendant may be convicted of only one.

(B)   Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶95}** In *State v. Bailey*, the First District Court of Appeals succinctly addressed the evolving standard applied by the Supreme Court of Ohio to determine whether allied offenses are subject to merger.  1st Dist. Hamilton No. C-140129, 2015-Ohio-2997, ¶ 75-77.  The First District espoused:

In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, the Ohio Supreme Court changed the standard for evaluating when allied offenses are subject to merger under the statute by overruling, in part, *State v. Rance*, 85 Ohio St.3d 632 (1999).  The test in *Rance* to determine merger called for the court to first compare the statutory elements "solely in the abstract." *Johnson* at ¶ 44.  Under *Johnson*, in determining whether allied offenses are subject to merger for purposes of R.C. 2941.25, courts must "consider the offenses at issue in light of the defendant's conduct," but are no longer to undertake

"any hypothetical or abstract comparison of the offenses at issue." *Id.*

at ¶ 46, 47.

*Id.* at ¶ 75.

**{¶96}** More recently, the Supreme Court of Ohio "clarified the *Johnson* test by stating that R.C. 2941.25 contemplates an evaluation of 'three separate factors— the conduct, the animus, and the import.'" *Id.* at ¶ 76, quoting *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, paragraph one of the syllabus. *See also State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, ¶ 12. "Separate convictions are permitted under R.C. 2941.25 for allied offenses if we answer affirmatively to just one of the following three questions: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separate? And (3) Were they committed with a separate animus or motivation." *Bailey* at ¶ 76, citing *Ruff* at paragraph three of the syllabus.

**{¶97}** Because it is dispositive, we will first address the dissimilar-import question of the tripart test. "As explained in *Ruff*, offenses are of dissimilar import 'when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.'" *Id.* at ¶ 77, quoting *Ruff* at paragraph two of the syllabus.

At its heart, the allied-offense analysis is dependent upon the facts of
a case because R.C. 2941.25 focuses on the defendant's conduct. The

evidence at trial * * * will reveal whether the offenses have similar import. When a defendant's conduct victimizes more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts.

*Ruff* at ¶ 26.

**{¶98}** Based on the evidence adduced at trial, we conclude that the offenses are of dissimilar import—that is, Potts's conduct victimized more than one person. *Compare State v. Nguyen*, 4th Dist. Athens No. 14CA42, 2015-Ohio-4414, ¶ 3 (concluding that "[t]he evidence of Nguyen's conduct supports the trial court's imposition of convictions for the aggravated burglary, rape, and kidnapping offenses because the record indicates that the offenses had separate victims") and *State v. Wells*, 12th Dist. Brown No. CA2015-10-026, 2016-Ohio-4589, ¶ 16 ("After reviewing the entire record, which includes transcripts from [Wells'] plea, sentencing, and a motion to suppress hearing, we find no merit to [Wells'] argument that the offenses * * * are allied offenses of similar import."). As we addressed above, the State presented evidence that Potts feloniously assaulted John. Moreover, the State also presented evidence at trial that Potts trespassed by force in 205 Wilch Street, Arlington, Ohio, a structure occupied by John and Kimberly, with the purpose to commit felonious assault on John by means of a deadly weapon. *See State v. Burton*, 7th Dist. Jefferson No. 13 JE 39, 2015-Ohio-2247, ¶ 56. *See also*

R.C. 2911.11(A)(2). Therefore, Potts's conduct constitutes offenses involving separate victims—John alone as to the felonious-assault offense and John *and* Kimberly as to the aggravated-burglary offense. *See State v. Howard-Ross*, 7th Dist. Mahoning No. 13 MA 0168, 2016-Ohio-1438, ¶ 15-17 (concluding that Howard-Ross's discharging-a-firearm-into-a-habitation and felonious-assault offenses were crimes of dissimilar import because Howard-Ross's "conduct impacted multiple victims"—the "act of felonious assault had one victim, the male victim, while the improper discharge offense had separate victims, the female victim and her daughter"). Accordingly, under the facts of this case, felonious assault and aggravated burglary are offenses of dissimilar import and Potts can be convicted of both offenses. *See State v. Giles*, 9th Dist. Summit No. 27339, 2015-Ohio-2132, ¶ 12 (concluding that Giles could be convicted of aggravated burglary and aggravated robbery because they were crimes of dissimilar import since Giles killed Cunningham after he entered the house, and since Giles stole "money from Patterson and Cunningham by the use of his firearm and by inflicting serious physical harm on Patterson"). Because "we may end our analysis upon an affirmative response to any of the three [Ruff] questions[,]" we need not address whether Potts committed the offenses separately or with separate animus. *Bailey*, 2015-Ohio-2997, at ¶ 83.

{¶99} Potts's fifth assignment of error is overruled.

**{¶100}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and ROGERS, J.J., concur.**

**/jlr**